## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-03271

TORRENCE BROWN-SMITH

> Plaintiff,

v.

THE BOARD OF TRUSTEES OF THE UNIVERSITY OF NORTHERN COLORADO,

> Defendant.

---

## COMPLAINT AND JURY DEMAND

---

Torrence Brown-Smith, Plaintiff, through his attorneys, Cheney Galluzzi & Howard, LLC, files the following Complaint against Defendant, The Board of Trustees of the University of Northern Colorado ("UNC"), and requests a trial by jury.

### INTRODUCTION

1. This case is about a Black male student who was denied due process and fair treatment in UNC's investigation of false allegations of non-consensual sexual activity that were made against him. That student, the Plaintiff, brings this action to rectify the harm done by UNC's unlawfully inadequate procedures, unfounded findings, and excessively harsh sanctions.

2. Torrence Brown-Smith, Plaintiff, was enrolled at UNC. He was set to graduate in May 2020. As the Black Student Union President, a Ronald E. McNair Scholar, and a

sociology researcher, he was an avid student and well-respected on campus. Unfortunately, Plaintiff was falsely accused of sexual misconduct.

3. In response to this accusation, Defendant UNC deprived Plaintiff of his student rights by repeatedly violating Defendant's own Student Code of Conduct (the "UNC Student Code" or the "Code"). Defendant's actions included a pre-determined conclusion that Plaintiff violated the Code, an inadequate investigation, failure to abide by Defendant's own due process procedures, failure to provide a hearing, failure to properly apply the standard of proof, and the imposition of excessively harsh sanctions.

4. All relevant investigators and decision-makers involved in Plaintiff's case are white.

5. Defendant discriminated against Plaintiff because he is a male student. Defendant's sex-based discrimination against Plaintiff, upon information and belief, was motivated in part by Defendant's receipt of the United States Department of Education Office for Civil Rights' 2011 Dear Colleague Letter (the "Dear Colleague Letter") and the pressure Defendant and other institutions faced in light of that Letter.

6. The Dear Colleague Letter to the Title IX of the Education Amendments of 1972 and its implementing regulation, 34 C.F.R. § 106, advanced new substantive rules and created binding obligations on the affected institutions under threat of severe penalties, including investigation and rescission of federal funding for non-compliant educational institutions.

7.  Upon information and belief, the federal government allocated approximately $154 billion to education in fiscal year 2015, making up approximately 4.2% of the entire federal budget.

8.  Since its enactment in 2011, the Dear Colleague Letter produced sweeping changes to the regulatory landscape and ensuing conduct by every educational institution receiving federal funding across the country.

9.  The Dear Colleague Letter, upon information and belief, has aggressively dictated how colleges and universities handle sexual assault and sexual harassment on campus, laying out specific requirements that schools must adopt and utilize, causing schools to brand more students "rapists" based on the excessively low "preponderance of the evidence" burden of proof (equating to a mere 50.01% probability that the alleged misconduct occurred), allowing accusers to appeal not-guilty findings by disciplinary panels, and preventing accused students from challenging their accusers, even in cases in which the only witness is the complainant, out of concern that cross-examination "may be traumatic or intimidating" to the "victim," all of which violate an accused student's fundamental rights to due process.

10. Defendant's inadequate implementation and enforcement of its policies resulted in discrimination on the basis of Plaintiff's sex when it failed to follow the correct investigatory, notice, and adjudicatory procedures because Plaintiff was a male student accused of sexual misconduct.

11. The allegations underlying the actions taken by Defendant concern an instance of consensual sexual activity that occurred during the evening of February 7, 2020 (the "Encounter"), between Plaintiff and Jane Doe ("Ms. Doe")[1], a fellow UNC student.

12. Ultimately, on May 1, 2020, Hearing Officer Colleen Sonnentag, Director of UNC Community Standards and Conflict Resolution ("CSCR"), sent Plaintiff a letter notifying him that he had been found responsible for violating UNC's Student Code (the "Decision").

13. UNC assessed an excessively harsh penalty, including, but not limited to, suspension until 2022 (the "Sanction"), preventing Plaintiff from graduating as he was set to do in May 2020.

14. Throughout the investigation and adjudication, Defendant UNC repeatedly failed to abide by UNC's own guidelines and regulations and acted in direct violation of federal and/or state law, including but not limited to: (i) Defendant failed to afford Plaintiff a hearing on the charges against him; (ii) Defendant failed to provide Plaintiff proper notice; (iii) Defendant deprived Plaintiff the opportunity to present favorable evidence; (iv) Defendant evidenced a gender bias against Plaintiff throughout the investigative process as a male student accused of sexual misconduct; (v) Defendant made assessments of credibility and evidentiary weight with respect to each party and witness without ascertainable rationale or logic; and (vi) Defendant failed to properly

---

[1] Plaintiff refrains from disclosing Jane Doe's identity herein because she is not a party to this action.

apply the standard of proof; and (vii) Defendant failed to utilize an adequate standard of review.

15. When Defendant subjected Plaintiff to disciplinary action, it did so in an arbitrary and capricious way, and discriminated against him on the basis of his male sex. In light of the evidence (or lack thereof), the Decision can only be explained by Defendant's discriminatory bias against males and its underlying motive to protect the University's reputation and financial wellbeing by acting in compliance with the Dear Colleague Letter.

16. Upon information and belief, in response to the significant pressure to comply with the mandates of the 2011 Dear Colleague Letter, Defendant utilized a substantially flawed and biased investigation process leading to an erroneous decision and sanction.

17. Plaintiff has been greatly damaged by Defendant's actions.

18. His education and career prospects have been severely compromised as he is now is functionally unable to gain admission to another university to obtain his degree and has lost the investment of the significant monies spent on obtaining a college education at UNC.

19. In addition to the damages sustained by Plaintiff, including his inability to continue his education and receive his degree, Plaintiff has sustained tremendous damages to his future education, career prospects, and reputation as a result of the Decision and Sanction.

20. Plaintiff therefore brings this action to obtain relief based on causes of action for, among other things, violations of Title IX of the Education Amendments of 1972, breach of contract, breach of the covenant of good faith and fair dealing, promissory estoppel, and any other state or federal law causes of action which may be inferred from the facts as set forth herein.

## THE PARTIES

21. Plaintiff is a twenty-two-year-old resident of Greeley, Colorado. At all times relevant to this action, he was an active student at UNC.

22. Upon information and belief, Defendant is responsible for making business and policy decisions for UNC and meets at the University Center on campus, located at 2101 10th Avenue, Greeley, Colorado 80634.

23. Plaintiff and Defendant are sometimes hereinafter collectively referred to as the "Parties."

## JURISDICTION AND VENUE

24. This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because: (i) the federal law claims arise under the Constitution and statutes of the United States; (ii) 28 U.S.C. § 1331 confers original jurisdiction on federal courts to review agency action; and (iii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

25. This Court has personal jurisdiction over Defendant on the grounds that it is conducting business within the State of Colorado.

26. Venue for this action is proper in this court pursuant to 5 U.S.C. § 703.

27. Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because Defendant is considered to reside in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

28. Further, venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391(e)(1) because a substantial part of the events or omissions giving rise to the claim occurred in this district and Plaintiff resides in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### I. *Agreements, Representations, Covenants & Warranties between Plaintiff and the University*

29. Plaintiff has lived in Colorado off and on his whole life. He completed high school at Gateway High School in Aurora, Colorado. In high school, Plaintiff discovered his love of writing and a passion for social justice. Plaintiff decided as a teenager that he wanted to go to college to study sociology, earn an advanced degree, and put his education to use advancing the rights and causes of all peoples.

30. Plaintiff applied to and was accepted by UNC in Greeley, Colorado. Plaintiff was in the UNC Class of 2020.

31. At UNC, Plaintiff blossomed academically and as an active student. He became the Black Student Union President, a Ronald E. McNair Scholar, and worked in sociology research while earning his degree.

32. Plaintiff was set to graduate with a Bachelor's Degree in Sociology in May 2020. Plaintiff had been accepted into a Ph.D. program at the University of Cincinnati.

33. During Plaintiff's time at UNC, UNC Student Code of Conduct (Revised 5/5/2010) (the "UNC Student Code") was in effect.

34. The Code prohibits the following misconduct:

   1. "……
   2. ……
   3. Physical abuse, verbal abuse, threats, intimidation, coercion, and/or other conduct which threatens or endangers the health or safety of any person, including one's self.
   4. ……
   5. Harassment, which consists of any verbal, visual, written or physical conduct that is sufficiently severe, persistent or pervasive that it adversely affects, or has the purpose or logical consequence of interfering with an individual's education or creates an intimidating, hostile or offensive environment.
      a. Sexual Harassment, which includes, but is not limited to non-consensual verbal or physical conduct related to sex which unreasonably interferes with an individual's work or educational performance or creates an intimidating, hostile, or offensive work, educational, or social environment; or is a violation of an individual's privacy.
   6. Sexual Misconduct, which is defined as:
      a. Sexual contact that is without consent by any party. It is the obligation of any person to obtain active consent from the other person prior to sexual contact. Examples of misconduct include, but are not limited to, touching another's genitals/breasts without consent; having sexual contact with someone whose decision making ability is compromised (e.g. from alcohol or drug usage); or continuing sexual activity after either party has made it clear, either verbally or by conduct, that they do not wish to have physical contact." UNC Student Code of Conduct, § III. B.

35. According to the Code, students "who violate the University standards of conduct . . . are subject to disciplinary action. The University **has designed hearing procedures that aim to engage students . . . in a fair**, educational, and developmental **process**." *Id.* § IV (emphasis added).

36. According to the UNC Student Code (Revised 5/5/2010), the relevant procedures for

"University Hearings" include:

1. When a disciplinary case is referred to or acted upon by the Chief Disciplinary Officer or designee, the procedure will normally be conducted in an informal manner. Discussion, inquiry, persuasion, and other existing informal procedures will normally be used. **The student . . . subject to disciplinary action will be informed at least three (3) days prior to the hearing of a summary of the alleged behavior and code of conduct violation and the time and place of the hearing.** Pending such action, the student or recognized student organization has the right to be present on campus, attend classes, or conduct organizational business except in cases of interim suspension.

2. . . .

3. The **student or recognized student organization must submit to the Hearing Officer a list of any witnesses and/or information for review 24 hours prior to the scheduled hearing**.

4. The **University Hearing Officer shall conduct the hearing.** The Hearing Officer, in keeping with fair and reasonable guidelines, may impose limits upon the number of witnesses and the amount of information that may be introduced where proffered information is cumulative, redundant or immaterial. Rules of evidence and rules of procedure do not apply. **Reasonable rules on relevancy and fairness will guide the Hearing Officer in determining the admissibility of information.** In every case, the facts are to be reviewed and decisions made based upon a preponderance of evidence. **The burden of establishing the basis for any disciplinary action shall be on the University.**

5. . . .

6. . . .

7. The University Hearing Officer shall serve as the deciding body and shall impose sanctions as appropriate." *Id.* § IV (emphasis added).

37. The Code provides poor notice and explanation regarding the distinctions between a "hearing"

or a "meeting" during the investigatory process.

38. The UNC Student Code does not define "hearing".

39. The UNC Student Code indicates the possibility of "a meeting or hearing as part of the

Student Conduct System".

40. The UNC Student Code indicates students have a duty to obey a notice from a University Hearing Officer or designated University Official "to appear for a meeting or hearing as part of the Student Conduct System."

41. The UNC Student Code, by instructing students to obey a notice from a University Hearing Officer or designated University Official to appear for "a meeting or hearing" as part of the Student Conduct System, differentiates between a meeting and a hearing without defining either.

42. The UNC Student Code does not explain that a meeting and a hearing seem to be, for all intents and purposes, one and the same.

43. Meeting is not a legal term. A meeting is an act or process of coming together.

44. A hearing is opportunity to be heard, to present one's side of a case, or to be generally known or appreciated.

45. A reasonable person would expect different consequences of a meeting versus a hearing.

46. A reasonable person would interpret the UNC Student Code to mean that a meeting and a hearing are not one and the same.

47. A reasonable person would interpret the UNC Student Code to mean that an accused student shall receive a hearing.

48. The UNC Student Code refers to the word "hearing" 48 times.

49. The UNC Student Code refers to the word "meeting" 2 times.

50. UNC University Hearings under the Code must be consistent with provisions of the UNC Student Code.

**II.**    *The night of February 7, 2020 (the "Incident")*

51. On February 6, 2020, Jane Doe posted a picture of herself on Snapchat, and Plaintiff commented on the photo telling her that he found her attractive. Ms. Doe replied to Plaintiff that she found him attractive, as well.

52. On February 7, 2020, Ms. Doe and Plaintiff both attended the Black Student Union meeting on UNC's campus.

53. Plaintiff and Ms. Doe continued to send messages to one another and arranged to hang out after the meeting, to "maybe grab tea," but did not set a "definitive destination."

54. Following the meeting, they initially went to High Brau Taphouse. Ms. Doe saw her former professor and spoke with him and met his wife. Plaintiff and Ms. Doe left after about ten minutes because the bar did not have tea. The two of them did not consume any alcohol that evening.

55. Plaintiff and Ms. Doe then drove to John Galt Coffeehouse Co. While at John Galt, Plaintiff and Ms. Doe played a card game called "Truth or Dare UNO!" It is played like "Truth or Dare," and during their time at John Galt they "did a lot of dares," which Plaintiff described as "more open-ended questions" than actual dares; he estimated that they had a ten-to-twelve minute conversation after each "dare."

56. While they were playing Uno Dare at John Galt, Ms. Doe told him about her previous sexual experiences including "threesomes" and "kinky sex." Ms. Doe also asked Plaintiff what he liked during sex.

57. Plaintiff and Ms. Doe left John Galt around 9:55 pm. Plaintiff then invited Ms. Doe to visit his off-campus residence to continue their conversation and watch a movie. Ms. Doe agreed and stated that she wanted popcorn.

58. Plaintiff then drove Ms. Doe to the Cinemark Greeley Mall where they purchased popcorn. When they arrived at his residence, they immediately went into his bedroom.

59. Ms. Doe initially sat down in the chair and Plaintiff was laying down on his bed, with his head toward the middle of the length of the bed. After a little while, Ms. Doe joined Plaintiff on his bed.

60. After a while, Plaintiff asked her if she wanted "to cuddle, as friends"; She said "okay" and they began to cuddle, and she fell asleep.

61. When Ms. Doe woke up, Plaintiff asked if he could kiss her; Ms. Doe said "I guess." Plaintiff started to kiss Ms. Doe at this point.

62. Plaintiff and Ms. Doe then kissed, which included passionate French-kissing. Ms. Doe's hands were on Plaintiff's shoulder and chest. One of his hands was around her waist and the other was around her back.

63. They both stopped kissing, Ms. Doe laughed, asked for water, and told him that she had to be careful because she could "go up a level." She also told him that he had soft lips. The two of them then continued kissing.

64. Plaintiff then got on top of Ms. Doe and, consistently with Ms. Doe's previously-stated preference for "kinky sex,"  Plaintiff put his hand on Ms. Doe's neck and put pressure on the sides of her neck so as not to put pressure on the front of her throat or cut off access to breathing. Plaintiff believed he was delivering the sexual activities that Ms. Doe preferred.

65. Plaintiff describes this sort of sexual choking action as lasting "not that long," and he stopped this action while the two of them were still engaged in kissing.

66. It appeared to Plaintiff that he had consent for this action because of their previous conversations about Ms. Doe's stated sexual preferences, her stated prior experience with "kinky sex," and their active engagement in sexual activity.

67. Plaintiff stopped that action and moved on from it on his own, and Ms. Doe did not address it that night. Ms. Doe did not say anything to Plaintiff at the time about the strangling action. They continued to engage in kissing.

68. The two of them then stopped kissing again, and Ms. Doe giggled; they then continued to kiss.

69. According to Plaintiff, he put his hand down Ms. Doe's pants and digitally penetrated her with her consent based on her body cues and the way she was reacting coupled with the rest of the context of their evening.

70. As Plaintiff put his hand down Ms. Doe's pants as they were kissing, Ms. Doe did not tell him to stop nor attempt to move his hand.

71. Ms. Doe sat up and told Plaintiff that she did not want things to progress further "because she wouldn't be able to stop herself if things heated up more." Plaintiff stopped and withdrew his hand from her pants.

72. There is no dispute that Ms. Doe did not say anything about pain or hurting to Plaintiff.

73. There is no dispute that when Ms. Doe sat up and "told Plaintiff she did not want things to progress further," Plaintiff stopped.

74. There is no dispute that when Ms. Doe told Plaintiff she did not want to keep going, it was because she "wouldn't be able to stop herself," not that she did not like Plaintiff or did not like what he was doing.

75. Plaintiff then tried to kiss Ms. Doe once more and acted like he would "go down on her." Ms. Doe laughed, and Plaintiff then stopped.  He stopped because he did not know what her laughing meant and sensed that he did not have consent to continue.

76. Ms. Doe did not say anything to Plaintiff to indicate that she did not enjoy their sexual activity.

77. Ms. Doe asked Plaintiff for a ride back to her car. Plaintiff gave Ms. Doe a ride back to her car. When Plaintiff dropped Ms. Doe back at her car, he told her he was going to "break her back," an allusion to high-quality sexual performance that, based on the evening, he thought would be something along the lines of welcome flirtation.

78. Plaintiff asked Ms. Doe to text him once she got home.

79. Ms. Doe did text Plaintiff or message him to let him know that she made it home.

80. The next day, Ms. Doe texted her friend about the Incident with Plaintiff. Ms. Doe appeared to regret the Incident.

81. Ms. Doe stated: "Like it was consensual because he asked permission for most stuff but idk dude part of me was like let's just see where this goes maybe there will be a connection ......"

82. Ms. Doe admits that the Incident was consensual.

83. Ms. Doe never told Plaintiff no or gave him a verbal indication that she did not want to proceed.

84. When Plaintiff asked for permission, permission was given.

85. When Ms. Doe asked Plaintiff to stop, Plaintiff stopped.

86. Nonetheless, in the days after the Incident, Ms. Doe felt uncomfortable and reported the interaction on campus during a walk-in intake appointment.

**III.**   *The University's Inadequate Investigation*

87. Ms. Doe reported the Incident during a walk-in interview with UNC Title IX Coordinator Larry Loften on February 11, 2020. According to Ms. Doe, Plaintiff "kissed her, choked her, touched the exterior of her genitals, and penetrated her vagina digitally"—all "without her consent."

88. Plaintiff received a Notice of Investigation on February 12, 2020.

89. Plaintiff met with UNC Investigator James Kohles on February 14, 2020.

90. On March 12, 2020, UNC sent Plaintiff a "Draft Investigation Report." The Report summarized facts and outlined contested and uncontested information gathered by Investigator Kohles. Both Plaintiff and Ms. Doe had the opportunity to submit comments to the Investigator and/or additional questions that either Party believed should be asked. Both Parties had five (5) business days to submit their feedback.

91. On April 24, 2020, UNC informed Plaintiff that it had completed its investigation, and that Plaintiff needed "to meet with a Hearing Officer to determine responsibility for the alleged violations and any outcomes, consequences, or next steps required."

92. On April 24, 2020, the same day, Plaintiff emailed the UNC Office of Community Standards and Conflict Resolution (CSCR) to schedule a meeting with a hearing officer.

93. CSCR replied to Plaintiff on the same day (April 24) to ask if Plaintiff was available to meet at 11 AM on the following Monday, April 27.

94. The meeting was not confirmed by the end of business on April 24.  Plaintiff responded at 6:19 PM on April 24 that 11 AM on April 27th would work.

95. On the morning of April 27, 2020, CSCR emailed Plaintiff at 9:26 AM apologizing that it had not confirmed the meeting, but advising nonetheless that CSCR had just sent a calendar invite for 11 AM that same morning.

96. CSCR at no point told him that the meeting would be the hearing required by the Code. Instead, CSCR told Plaintiff that it was only a meeting and that among the things discuss would be "next steps required." .

97. CSCR's emails to Plaintiff failed to specifically state that it was scheduling a "hearing".

98. Instead, CSCR told Plaintiff only that he needed to "meet with" an officer.

99. Plaintiff was not given notice of a hearing three days in advance.

100. CSCR gave him just 1 hour and 34 minutes' notice in advance of the meeting.

101. Plaintiff was required to submit any witnesses or information to support his position at the hearing at least 24 hours before the hearing.

102. Plaintiff was never informed of this fact in the correspondence from UNC.

103. Plaintiff never knew that he needed to submit any witnesses or information to support his position at the hearing, as he did not know it was a hearing at all.

104. Plaintiff was never told that he needed to submit any relevant materials to the Hearing Officer 24 hours in advance of the hearing.

105. To the extent that Plaintiff was cited to the Code, Plaintiff had no reason to know that this "meeting" was in fact the hearing outlined in the Code.

106. Plaintiff was not given any other information about his rights with respect to the CSCR process.

107.     Plaintiff was not informed that he may want to seek legal counsel regarding the allegations.

108.     The alleged "hearing" was merely a meeting with a Hearing Officer.

109.     The meeting lacked the formalities consistent with a hearing.

110.     No formalities were observed before or during the Hearing Officer's April 27th meeting.

111.     Instead, at this meeting, Plaintiff met with Colleen Sonnentag, Director of CSCR. Ms. Sonnentag essentially cross-examined Plaintiff about the things that had been said so far and the investigation's report. Plaintiff did not have the opportunity to present witnesses. Plaintiff did not have an adviser with him. In short, Plaintiff was not afforded a hearing at all.

112.     CSCR issued a letter to Plaintiff on May 1, 2020, finding Plaintiff "Responsible" for violating the UNC Student Code of Conduct.

113.     CSCR's May 1, 2020, decision letter makes no reference to having held a hearing.

114.     CSCR's May 1, 2020, decision letter refers to the April 27, 2020, "meeting" at least 5 times.

115.     The Hearing Officer's April 27th meeting was not a hearing.

116.     Mr. Brown-Smith was not given three days' notice of the meeting.

117.     Plaintiff was not given the materials being used against him in advance of the meeting.

118.     Plaintiff was not given notice that he had to turn in his own materials no later than 24 hours before the meeting.

119.     Plaintiff was not given a proper hearing on his alleged conduct violations.

120.    In its June 24, 2020, response to Plaintiff's Statement of Appeal, CSCR stated that a
hearing had been held.

121.    In its June 24, 2020, response to Plaintiff's Statement of Appeal, CSCR stated that "the
hearing was held during a time which was agreed up [sic] by both parties".

122.    In its June 24, 2020, response to Plaintiff's Statement of Appeal, CSCR <u>twice</u>
characterized the April 27, 2020, meeting as a "hearing".

123.    At no point in its June 24, 2020, response to Plaintiff's Statement of Appeal did CSCR
refer to the April 27, 2020, meeting as a "meeting."

124.    In its June 24, 2020, response to Plaintiff's Statement of Appeal, CSCR did not
conclude that Plaintiff was deprived of a hearing.

125.    In its June 24, 2020, response to Plaintiff's Statement of Appeal, CSCR did not
conclude that Plaintiff was deprived of the opportunity to submit favorable information,
witnesses, and/or other evidence.

126.    In its June 24, 2020, response to Plaintiff's Statement of Appeal, CSCR stated that due
process owed to Plaintiff "was not denied".

127.    UNC did not correctly follow the procedures set forth in the Student Code of
Conduct.

128.    UNC failed to inform Plaintiff of his rights.

129.    UNC denied Plaintiff the opportunity to participate in a hearing.

130.    Defendant violated Plaintiff's student rights.

**IV.**     *Gender bias against Plaintiff as the male accused*

131.     Upon information and belief, there are no reported incidents of male complainants against female students for sexual assault that have been investigated by UNC.

132.     Upon information and belief, there are no reports of female accused students being disciplined for sexual misconduct against male complainants at UNC.

133.     UNC was required to conduct an impartial and unbiased investigation process when evaluating an allegation of sexual misconduct against Plaintiff.

134.     Upon information and belief, Defendant UNC is knowledgeable of the fact that complaints of sexual misconduct are disproportionately lodged by females against males.

135.     Upon information and belief, Defendant UNC has recognized the increased pressure, both internally and from the United States government, to aggressively discipline male students accused of sexual misconduct.

136.     UNC demonstrated a bias against Plaintiff as the male accused when it failed to hold a hearing in violation of Plaintiff's right to fair process.

137.     Upon information and belief, UNC was not a neutral and unbiased fact finder, but discriminated against Plaintiff throughout the process by failing to undertake an impartial investigation and hearing process.

138.     Moreover, UNC's policies and procedures are set up to disproportionately affect the male student population as a result of the higher incidence of female complainants of sexual misconduct against male complainants of sexual misconduct.

139.     Based on the foregoing, UNC evidenced a clear gender bias against Plaintiff as the male accused throughout the investigation and hearing process, in violation of Title IX and his rights to fair process.

**V.**     *Failure to Apply Correct Evidentiary Standard*

140.     UNC's Code defines preponderance of the evidence as whether "what is alleged to have happened is more likely than not what happened"

141.     The Hearing Officer found that it was more likely than not that Plaintiff committed physical abuse, harassment, and sexual misconduct.

142.     The decision and sanctions hinge on whether there was consent for the activities in which Plaintiff and Ms. Doe engaged. The overwhelming weight of the evidence was that the entire Incident was consensual. While Ms. Doe regretted the Incident, and perhaps really does feel uncomfortable about it, there is no doubt that Ms. Doe consented to the activity during the Incident.

143.     Ms. Doe verbally consented to the activities that she engaged in with Plaintiff.

144.     Ms. Doe specifically consented to the activities that she engaged in with Plaintiff.

145.     The April 24, 2020, letter from OIEC to Plaintiff included a document entitled University of Northern Colorado Title IX Investigation Report (the "Report").

146.     The Investigation Witness Interview of Abril Olivas begins on Page 13 of the Report.

147.     According to the report, on February 8, 2020, Ms. Doe sent Ms. Olivas a text message stating: "Like it was consensual because he asked permission for most stuff but idk dude part of me was like let's just see where this goes maybe there will be a connection ... idk how to say no".

148.     On February 8, 2020, Ms. Doe sent Ms. Olivas text messages stating twice that Plaintiff asked for permission during their encounter.

149.     Ms. Doe stated the Incident was consensual.

150.     Ms. Doe was sober throughout the Incident.

151.     Plaintiff was sober throughout the Incident.

152.     Ms. Doe stated that Plaintiff asked her for permission.

153.     Ms. Doe never told Ms. Olivas that she did not consent.

154.     The report states "Based on the text messages, [Ms. Olivas] believed [Ms. Doe] was expressing regret and felt guilty about the incident."

155.     The report states Ms. Olivas "was surprised by" Ms. Doe's later texts stating that Ms. Doe did not give consent to sexual contact with Plaintiff.

156.     The report states Ms. Olivas "was surprised by" Ms. Doe's later texts stating that Ms. Doe did not give consent to sexual contact with Plaintiff because Ms. Doe "was now stating that the sexual contact was nonconsensual."

157.     The Hearing Officer did not correctly apply the preponderance of the evidence standard.

158.     The Hearing Officer's finding was unsupported by evidence.

159.     The Hearing Officer stated that Ms. Doe's giggling and saying "I guess" before kissing Plaintiff was an "equivocal response that cannot be construed as active consent."

160.     The Hearing Officer's finding contradicted the weight of the evidence indicating that Ms. Doe had consented.

161.     The Hearing Officer's findings are contradicted by Ms. Doe's own admissions.

162.     Based on the totality of the evening and the sequence of events that transpired, a reasonable person would have believed that Ms. Doe consented to the activities in which she and Plaintiff engaged.

163.        On May 1, 2020, the Hearing Officer sent Plaintiff the decision finding him responsible for violating UNC's Student Code and imposing the following sanctions:

    a. University SUSPENSION until 2022;
    b. No Trespass Order;
    c. Intake Assessment with a licensed professional counselor and any recommended treatment;
    d. A Plan for Success (a high-quality 3-4 page writing assignment);
    e. An 8-10 page research paper;
    f. A follow-up meeting with UNC; and
    g. No Contact.

164.        The sanctions and punishments imposed are not appropriate given the totality of the facts of this case.

## VI.    *Title IX of the Education Amendments of 1972*

165.        On June 23, 1972, President Richard M. Nixon signed Title IX of the Education Amendments of 1972, 20 U.S.C.A. § 1681, et seq., into law. A comprehensive federal law that prohibits discrimination on the basis of sex in any federally funded education program or activity, the principal objective of Title IX is to avoid the use of federal money to support sex discrimination in education programs and to provide individual citizens effective protection against those practices.[2]

166.        The statute provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

167.        Title IX applies, with a few specific exceptions, to all aspects of federally funded education programs or activities, including educational institutions such as colleges, universities,

---

[2] https://www.justice.gov/crt/overview-title-ix-education-amendments-1972-20-usc-1681-et-seq.

and elementary and secondary schools, as well as any education or training program operated by a recipient of federal financial assistance.

168.     Pursuant to the Revised Sexual Harassment Guidance dated January 19, 2001 (the "2001 Guidance"), the Department of Education first interpreted Title IX or the regulations thereunder as requiring schools to "adopt and publish a policy against sex discrimination and grievance procedures providing for prompt and equitable resolution of complaints of discrimination on the basis of sex." 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (emphasis added).[3]

169.     The 2001 Guidance further instructed that the procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also *"[accord] due process to both parties involved..."*[4]

170.     To ensure the requisite level of due process, the 2001 Guidance identified the minimum level of procedures that must be in place, including:

- "Notice . . . of the procedure, including where complaints may be filed";

- "Application of the procedure to complaints alleging [sexual] harassment...";

- "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

- "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

- "Notice to the parties of the outcome of the complaint......"[5]

---

[3] *See generally* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 19-20, 21 & nn.98-101.

171.     Further, the 2001 Guidance instructed that a school has an obligation under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes "alleged sexual assaults."

172.     Significantly, nowhere in the 2001 Guidance was the "preponderance of the evidence" standard mentioned.

173.     Rather, in its Revised Sexual Harassment Guidance of 2001, the OCR provided colleges and universities with wide latitude in adopting policies and procedures that best fit the particular institution, noting: "[p]rocedures adopted by schools will vary considerable in detail, specificity, and components, reflecting differences in audiences, school sizes and administrative structures, State or local legal requirements, and past experience." 7

174.     As such, the subsequent enactment of uniform procedures and standards of review as promulgated by the 2011 Dear Colleague Letter unambiguously created a new set of binding rules and imposed new obligations on the affected parties.

**VII.**   *The 2011 Dear Colleague Letter*

175.     The 2011 Dear Colleague Letter was formally announced by Vice President Joe Biden and former U.S. Secretary of Education Arne Duncan at the University of New Hampshire on April 4, 2011.

176.     According to DOE officials, the Dear Colleague Letter was designed to "help schools better understand their obligations under Title IX to prevent and respond to sexual violence."

177.     However, the 2011 Dear Colleague Letter was not, in practice or effect, a genuine guidance document, as it instructed educational institutions receiving federal funds to adopt

specific procedures in the handling of sexual misconduct cases, and coerced the schools' compliance by threatening to rescind potentially billions of dollars in federal funding.

178.    Since its enactment, the 2011 Dear Colleague Letter has aggressively dictated how colleges handle sexual assault and sexual harassment on campus, by laying out specific requirements that schools must adopt and utilize, which essentially equate the filing of a complaint to guilt, and promulgating an overly broad definition of sexual harassment.

179.    Specifically, the requirements outlined in the Dear Colleague Letter have pressured schools to crack down on sexual misconduct investigations, causing schools to brand more students "rapists" based on the excessively low "preponderance of the evidence" burden of proof (equating to a mere 50.01% probability that the alleged misconduct occurred), allowing accusers to appeal not-guilty findings by disciplinary panels, and preventing accused students from challenging their accusers, even in cases in which the only witness is the complainant, out of concern that cross-examination "may be traumatic or intimidating" to the "victim."

180.    The Dear Colleague Letter's elimination of the accused's right to cross-examination is of particular concern. It is well established that cross-examination is a fundamental procedural protection and "beyond any doubt the greatest legal engine ever invented for the discovery of truth." Especially in cases where a determination of responsibility hinges on the credibility of the parties and witnesses, as it did in Plaintiff's case, the right to cross-examine one's accuser is essential to ensure due process.

181.    Upon information and belief, to avoid a governmental investigation and potential loss of federal funds, UNC enforced its policies and procedures in a way that unfairly disadvantaged male accused students in order to conform to the mandates of the Dear Colleague Letter.

182.     Based on the foregoing, UNC's attempted compliance with the Dear Colleague

Letter's arbitrary and capricious directives contributed to an erroneous finding of responsibility

against Plaintiff.

### FIRST CAUSE OF ACTION
### Violation of Title IX of the Education Amendments of 1972

183.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth

herein.

184.     Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No

person in the United States shall, on the basis of sex, be excluded from participation in, be

denied the benefits of, or be subjected to discrimination under any education program or

activity receiving Federal financial assistance."

185.     Title IX of the Education Amendments of 1972 applies to an entire school or

institution if any part of that school receives federal funds; hence, athletic programs are subject

to Title IX of the Education Amendments of 1972, even though there is very little direct

federal funding of school sports.

186.     Upon information and belief, UNC receives federal funding for research and

development.

187.     The Department of Education and the Department of Justice have promulgated

regulations under Title IX that require a school to "adopt and publish grievance procedures

providing for the *prompt and equitable resolution* of student... complaints alleging any action which

would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of

Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (*emphasis added*). Such prohibited actions

include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.

188.     The procedures adopted by a school covered by Title IX must not only "ensure the

Title IX rights of the complainant," but must also *"[accord] due process to both parties involved...".*

189.     The "prompt and equitable" procedures that a school must implement to "accord due

process to both parties involved" must include, at a minimum:

- "Notice . . . of the procedure, including where complaints may be filed";

- "Application of the procedure to complaints alleging [sexual] harassment...";

- "Adequate, reliable, and impartial investigation of complaints, including the
  opportunity to present witnesses and other evidence";

- "Designated and reasonably prompt timeframes for the major stages of the complaint
  process"; and

- "Notice to the parties of the outcome of the complaint......"

190.     UNC also has an obligation under Title IX to make sure that all employees involved in

the conduct of the procedures have "adequate training" as to what conduct constitutes sexual

harassment, which includes "alleged sexual assaults."

191.     Based on the foregoing, Defendant deprived Plaintiff, on the basis of his sex, of his

rights to due process and equal protection through the improper administration of and/or the

existence, in its current state, of UNC's guidelines and regulations.

192.     Based on the foregoing, Defendant conducted its adjudication in a manner that was

biased against Plaintiff.

193.     Defendant has created an environment where an accused male student is

fundamentally denied due process by being prosecuted through the conduct process under a

presumption of guilt.

27

194.     Such a one-sided process deprived Plaintiff, as a male student, of educational opportunities at UNC on the basis of his sex.

195.     Defendant had no intention of following its own policies and procedures for Plaintiff as a male accused of sexual misconduct when it found Plaintiff responsible for sexual misconduct despite the weight of the evidence to the contrary.

196.     Defendant applied its stated policies and procedures and gender-biased practices in a manner that discriminated against Plaintiff on the basis of his sex and led to an erroneous and adverse outcome. Specifically:

- Defendant disregarded all evidence tending to exculpate Plaintiff, including the message Ms. Doe sent to Ms. Olivas after the encounter admitting that the encounter was consensual.

- Defendant denied Plaintiff of the opportunity to identify witnesses favorable to his defense.

- Defendant deprived Plaintiff of the right to a formal hearing before a panel of impartial decision makers, denied him of the opportunity to confront and question his accuser, and denied him the ability to challenge all witnesses against him.

- Defendant failed to provide Plaintiff meaningful rationale for its Decision.

197.     Upon information and belief, all students that have been expelled from UNC for sexual misconduct have been male.

198.     Upon information and belief, UNC has demonstrated a pattern of inherent and systematic gender bias and discrimination against male students accused of misconduct.

199.     Upon information and belief, UNC's mishandling of Plaintiff's investigation was wrongfully informed by federal pressure.

200.     The decision was the result of a predetermined, biased, prejudiced and implicitly unfair process.

201.     The decision was calculated to reach the conclusion that Plaintiff was responsible for the misconduct alleged.

202.     Based on the foregoing, Defendant imposed an unwarranted and excessive sanction on Plaintiff as a result of an erroneous outcome reached by a flawed investigation.

203.     Based on the foregoing, male respondents in sexual misconduct cases at UNC are discriminated against solely on the basis of sex.

204.     Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and explicitly unfair process in violation of Title IX.

205.     As a direct and proximate result of the above conduct, Plaintiff sustained damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

206.     As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### SECOND CAUSE OF ACTION
### Violation of the Fourteenth Amendment of the
### United States Constitution Procedural Due Process

207.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

208.    The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

209.    A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

210.    A person has a protected property interest in pursuing his education, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

211.    Plaintiff's constitutionally protected property interest in his continued enrollment at UNC and to be free from arbitrary dismissal arises from the policies, courses of conduct, practices and understandings established by UNC.

212.    Plaintiff's constitutionally protected property interest further arises from the express and implied contractual relationship between UNC and Plaintiff.

213.    It is well established that Fourteenth Amendment due process protections are required in the higher education disciplinary proceedings.

214.    Thus, a person who has been admitted to a university, and who has paid tuition to that university, has a protected property interest in continuing his education at that university until he has completed his course of study. The state cannot deprive a person of this interest without due process.

215.    As a result, if Plaintiff as a UNC student faced disciplinary action that included the possibility of suspension or dismissal if found responsible for alleged sexual misconduct, then the Due Process provisions of the Fourteenth Amendment to the United States Constitution applied to the disciplinary process UNC used.

216.     Defendant UNC, as a public university, has an absolute duty to provide its students equal protection and due process of law by and through any and all policies and procedures set forth by the University.

217.     Plaintiff had made exceptional academic progress and had obeyed all institutional rules when he was wrongly suspended from UNC.

218.     Under both federal and state law, Plaintiff had a constitutionally protected property interest in continuing his education at UNC.

219.     Plaintiff was entitled to process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing. The allegations in this case resulted in a sanction that will have lifelong ramifications for Plaintiff, and are quasi-criminal in nature.

220.     Plaintiff was entitled to fundamentally fair procedures to determine whether he was responsible for the alleged sexual misconduct.

221.     In the course of such investigation and adjudication, UNC flagrantly violated Plaintiff's clearly established rights under the Due Process Clause of the Fourteenth Amendment through its repeated acts of gender bias and of deprivation of the minimal requirements of procedural fairness, due in part to pressure Defendant faced from the Dear Colleague Letter.

222.     Upon information and belief, UNC was pressured by the Department of Education into complying with the Title IX investigative and adjudicatory process mandated by the 2011 Dear Colleague Letter and by subsequent federal actions, statements, and directives.

223.     UNC deprived Plaintiff of his liberty and property interests without affording him basic due process, including, but not limited to, his right to a fair adjudication, his right to be

informed of the exact charges against him, his right to be heard by an impartial factfinder, to question his accuser, challenge the credibility of other adverse witnesses and present evidence and witnesses in support of his defense. Defendant conducted a superficial investigation and hearing biased against Plaintiff as a Black male student accused of sexual misconduct.

224.    UNC subjected Plaintiff to an insufficient process when they failed to provide Plaintiff with a fair and reasonable opportunity to defend himself and arrived at a predetermined, arbitrary and unwarranted decision tainted by gender bias.

225.    As a result, Defendant failed to provide Plaintiff with the basic due process protections that they are required to provide students accused of sexual misconduct.

226.    UNC was acting under color of state law when they showed intentional, outrageous, and reckless disregard for Plaintiff's constitutional rights.

227.    As a result of these due process violations, Plaintiff continues to suffer ongoing harm, including damages to his reputation and other non-economic and economic damages. He is unable to accept his admission into a graduate studies program because of the erroneous disciplinary finding.

228.    Accordingly, UNC is liable to Plaintiff for violations of the Due Process Clause of the Fourteenth Amendment, and for all damages arising therefrom.

229.    As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational, athletic and career opportunities, economic injuries and other direct and consequential damages.

230.     Plaintiff is entitled to injunctive relief from UNC's actions. Plaintiff's injunctive relief should include: vacating the finding of sexual misconduct against him, readmitting Plaintiff as a student at UNC, and allowing Plaintiff to graduate as he was set to do in May 2020.

231.     As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### THIRD CAUSE OF ACTION
### Breach of Contract

232.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

233.     Based on the foregoing, Defendant created express and implied contracts when Plaintiff accepted an offer of admission to UNC and paid the tuition and fees.

234.     Based on the aforementioned facts and circumstances, Defendant breached express and/or implied agreement(s) with Plaintiff.

235.     Defendant committed several breaches of its agreements with Plaintiff during the investigation and hearing process. A non-exhaustive list of Defendant's breaches follows:

**Defendant failed to conduct a fair and impartial investigation.**

236.     UNC's Code refers to the impartiality of a Hearing Officer and provides that "The University has designed hearing procedures that aim to engage students . . . in a fair, educational, and developmental process." It notes that "the burden of establishing the basis for any disciplinary action shall be on the University."

237.     Defendant breached its contract with Plaintiff when it failed to conduct a fair and impartial investigation.

238.     Based on the foregoing, Defendant conducted a one-sided and biased investigation against Plaintiff when, among other things, they accepted the statements of third-party non-witnesses as more credible than Plaintiff and ignored evidence tending to exculpate Plaintiff of any wrongdoing.

239.     UNC breached its own self-imposed policies when it pursued an investigation calculated to lead to the foregone conclusion that Plaintiff was responsible for the misconduct alleged.

**Failure to provide Plaintiff with a hearing.**

240.     UNC's Code explicitly provides that a student involved in a disciplinary proceeding has the right to a hearing: "The student . . . subject to disciplinary action will be informed at least three (3) days prior to the hearing of a summary of the alleged behavior and code of conduct violation and the time and place of the hearing."

241.     Notwithstanding its own Code, Defendant deprived Plaintiff of the opportunity to have proper hearing with 3 days' advance notice, despite the severity of the charges against him and the potentially devastating effects on his future academic and professional career.

242.     UNC's Code authorizes a student accused of misconduct to submit "witnesses and/or information for review 24 hours prior to the scheduled hearing".

243.     Notwithstanding UNC's Code, Plaintiff was denied the opportunity to present witnesses in support of his defense because Defendant provided Plaintiff with neither 3 days' notice prior to a hearing nor an actual hearing.

34

244.    Plaintiff was denied the opportunity to present witnesses in support of his defense because Defendant never informed Plaintiff of the requirements for submitting witnesses and/or information.

245.    Defendant prevented Plaintiff from establishing his credibility when he was prohibited from challenging the witness against him, in violation of his contractual and due process rights.

246.    Based on the foregoing, at no time was Plaintiff afforded the procedural guarantees that generally accompany a hearing, such as the right to present witnesses and evidence, confront one's accuser, and challenge any witnesses against him, all before an impartial and objective factfinder.

247.    Defendant violated the contract with Plaintiff when it failed to afford him a proper hearing on the charges against him as set forth in the Student Code.

**Failure to utilize the preponderance of the evidence standard.**

248.    The U.S. Department of Education Office for Civil Rights requires that the excessively low preponderance of the evidence burden of proof be used to evaluate allegations of sexual misconduct.

249.    Though an inadequate standard to protect the procedural rights of accused students, Defendant enforced this standard of review. As such, UNC's Code defines preponderance of the evidence as whether "what is alleged to have happened is more likely than not what happened".

250.    Further, UNC's Code provides that "The burden of establishing the basis for any disciplinary action shall be on the University."

251.    Assuming *arguendo* that such a standard of review was proper in the disciplinary context, Defendant violated this provision when it improperly placed the burden of proof on Plaintiff to prove that Ms. Doe consented to the encounter, rather than requiring Complainant to prove that Ms. Doe had not consented.

252.    Ms. Doe stated the encounter was consensual.

253.    Ms. Doe stated that Plaintiff asked her for permission.

254.    The Hearing Officer's finding was unsupported by evidence.

255.    The Hearing Officer's finding contradicted the weight of the evidence indicating that Ms. Doe had consented.

256.    The Hearing Officer's findings are contradicted by Ms. Doe's own admissions.

257.    Defendant thus breached its agreement with Plaintiff when it failed to utilize the preponderance of the evidence standard in reaching its Decision.

258.    Had it done so, it would have reached the opposite conclusion; namely, that the encounter was consensual.

259.    Defendant therefore breached its contract with Plaintiff when it failed to utilize the requisite preponderance of the evidence standard.

260.    Plaintiff is entitled to recover damages for Defendant's breach of the express and/or implied contractual obligations described above.

261.    As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

262.     As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### THIRD CAUSE OF ACTION
### Breach of the Covenant of Good Faith and Fair Dealing

263.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

264.     Based on the aforementioned facts and circumstances, Defendant acted in bad faith when it meted out a disproportionate Sanction notwithstanding the flawed hearing process and lack of evidence in support of Ms. Doe's allegations of sexual misconduct.

265.     Based on the aforementioned facts and circumstances, Defendant breached and violated a covenant of good faith and fair dealing implied in the agreement(s) with Plaintiff.

266.     As a direct and foreseeable consequence of these breaches, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

267.     Plaintiff is entitled to recover damages for Defendant's breach of the express and/or implied contractual obligations described above. As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### FOURTH CAUSE OF ACTION
### Promissory Estoppel

268.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

269.     Defendant's various policies constitute representations and promises that it should have reasonably expected to induce action or forbearance by Plaintiff.

270.     Defendant expected or should have expected Plaintiff to accept UNC's offer of admission, incur tuition and fees expenses, and choose not to attend other colleges based on its express and implied promises that UNC would not tolerate, and Plaintiff would not suffer, discrimination or harassment by fellow students or faculty members and would not deny Plaintiff his procedural rights should he be accused of a violation of UNC's policies.

271.     Plaintiff relied to his detriment on these express and implied promises and representations made by Defendant, by choosing to attend UNC rather than other schools of equal caliber and paying the required tuition and fees.

272.     These express and implied promises and representations made by Defendant must be enforced to prevent substantial injustice to Plaintiff.

273.     Based on the foregoing, Defendant is liable to Plaintiff based on promissory estoppel.

274.     As a direct and proximate result of the above conduct, Plaintiff sustained damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

275.     As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## **PRAYER**

WHEREFORE, Plaintiff Torrence Brown-Smith prays for the following from this Honorable Court:

1.  On the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment awarding Plaintiff injunctive and declaratory relief;

2.  On the second cause of action for breach of contract, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

3.  On the third cause of action for breach of the covenant of good faith and fair dealing, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

4.  On the fourth cause of action for promissory estoppel, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

5.  A judicial declaration that (i) the outcome and findings made by UNC be reversed; (ii) Plaintiff's reputation be restored; (iii) Plaintiff's disciplinary record be expunged; (iv) the record of Plaintiff's suspension from UNC be removed from his education file; (v) any record of the complaint against Plaintiff be permanently destroyed; (vi) Plaintiff be readmitted to UNC so

that he may graduate; and (vii) UNC's rules, regulations and guidelines are unconstitutional as applied; and such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

DATED this 2nd day of November, 2020.

<div style="margin-left:40%">

Respectfully submitted,

*s/ Timothy Galluzzi*
**Timothy Galluzzi, #48211**
CHENEY GALLUZZI & HOWARD, LLC
1888 Sherman Street, Suite 200
Denver, Colorado 80203
Telephone: (303) 209-9395
E-mail: tim@cghlawfirm.com

*s/ Kevin Cheney*
**Kevin Cheney, #49333**
CHENEY GALLUZZI & HOWARD, LLC
Telephone: (303) 209-9395
E-mail: kevin@cghlawfirm.com

*Attorneys for Plaintiff Torrence Brown-Smith*

</div>