IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-03271-MEH

TORRENCE BROWN-SMITH,

     Plaintiff,

v.

BOARD OF TRUSTEES OF THE UNIVERSITY OF NORTHERN COLORADO,

     Defendant.

_____

# ORDER
_____

**Michael E. Hegarty, United States Magistrate Judge**.

     Before the Court is Defendant's Motion to Dismiss. ECF 36. Plaintiff brings this lawsuit against Defendant, the Board of Trustees of the University of Northern Colorado, pursuant to 20 U.S.C. § 1681, *et seq.* ("Title IX") alleging gender discrimination, and pursuant to 42 U.S.C. § 1983 for violations of his Fourteenth Amendment constitutional right to due process. Plaintiff alleges an unfair and discriminatory investigation and determination of sexual misconduct by Defendant, motivated by his male gender. Defendant moves for dismissal on the basis of failure to state a claim in regard to Plaintiff's allegations of gender discrimination, and on the basis of sovereign immunity in regard to his due process claim. The Motion is fully briefed, and the Court finds that oral argument will not materially assist in its adjudication. For the reasons that follow, the Motion is granted.

# BACKGROUND

     For purposes of this order, the Court accepts as true the factual allegations—but not any legal conclusions, bare assertions, or conclusory allegations—that Plaintiff raises in his Amended

Complaint (ECF 28). *See generally Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (accepting as true a plaintiff's factual allegations for purposes of Fed. R. Civ. P. 12(b)(6) analysis).

Plaintiff alleges that in May 2020, he was unjustly suspended from the University of Northern Colorado ("UNC") based on a false accusation of sexual misconduct by a fellow student and a biased investigation by Defendant. ECF 28 ¶¶ 2-10. The allegedly false accusation relates to an instance of sexual activity between Plaintiff and Ms. Doe (name undisclosed, not a party to this action) which occurred on February 7, 2020. *Id.*

Plaintiff's description of his history with Ms. Doe, and their encounter in question, is as follows: Plaintiff was a student at UNC and was set to graduate in May 2020. *Id.* at ¶ 2. Ms. Doe met Plaintiff through their mutual involvement in the Black Student Union, of which Plaintiff was the President. *Id.* at ¶¶ 2, 51. Prior to February 7, Plaintiff and Ms. Doe had exchanged messages with each other, each commenting that they found the other attractive, and had made plans to spend time together after a meeting of the Black Student Union on February 7. Together, they went to a taphouse, though neither consumed alcohol, and later a coffeeshop, where they had conversations and "did a lot of dares" in connection with a game. *Id.* at ¶¶ 53-54. As a part of this game, Ms. Doe disclosed that her sexual history included "threesomes" and "kinky sex." *Id.* at ¶ 55.

When they left the coffeeshop, they agreed to go to Plaintiff's off-campus residence to watch a movie. *Id.* at ¶ 56. During the movie, Ms. Doe joined Plaintiff on his bed, after briefly "cudd[ling], as friends" Ms. Doe fell asleep. *Id.* at ¶ 59. When she awoke, Plaintiff asked if he could kiss her, to which her response was, "I guess." *Id.* at ¶ 60. Plaintiff then kissed Ms. Doe with his hands around her back and waist. After a short interlude where Ms. Doe stated that she had to be careful because she could "go up a level," they began to kiss again, and Plaintiff briefly applied pressure on the sides of her neck to simulate strangling her, out of a belief (based on her body

language and prior statements) that this was a sexual activity she preferred. *Id.* at ¶¶ 62-64. Plaintiff believes that he had consent for these actions based on her prior statements regarding her sexual history. *Id.* at ¶¶ 55, 65. After another brief pause, Plaintiff began to digitally penetrate Ms. Doe. *Id.* at ¶¶ 68-69. Plaintiff notes that after this began, Ms. Doe sat up and told him "she did not want things to progress further 'because she wouldn't be able to stop herself if things heated up more.'" *Id.* at ¶ 70. Plaintiff alleges that Ms. Doe did not object or express displeasure at any point during the encounter until this statement. *Id.* at ¶ 70. Plaintiff immediately removed his hand from her pants but positioned himself as if to perform oral sex; however, he did not continue because he was unsure if Ms. Doe consented to that act. *Id.* at ¶¶ 74-75. There was no further sexual contact after this point. Plaintiff proceeded to drive Ms. Doe to her car, upon her request, and she later texted him to confirm when she had made it to her home. *Id.* at ¶ 76-78.

The next day, Ms. Doe texted a friend and wrote, in regard to her encounter with Plaintiff, "Like it was consensual because he asked for permission for most stuff but idk dude part of me was like [sic] let's see where this goes maybe there will be a connection." *Id.* at ¶¶ 79-80. A few days later, Ms. Doe reported the incident during a walk-in intake interview with UNC's Title IX Coordinator, Larry Loften. *Id.* at ¶¶ 85-86. Ms. Doe described the sexual activities with Plaintiff and told Mr. Loften that they were performed without her consent. *Id.* at ¶87. In response, UNC initiated a Title IX investigation into the incident. Plaintiff received notice of the investigation and met with a UNC Investigator in the days following. *Id.* at ¶¶ 87-88. Approximately one month later, Plaintiff received a "Draft Investigative Report," which summarized contested and uncontested facts from each party, and gave five days during which both could submit comments to UNC regarding the findings. *Id.* at ¶ 89. Another month later, on April 24, Plaintiff was informed that UNC had completed its investigation, and required him to "meet with a Hearing Officer to

determine responsibility for the alleged violations and any outcomes, consequences, or next steps required." *Id.* at ¶ 90. Plaintiff emphasizes that he was not informed that this meeting constituted a "hearing" as described in UNC's Student Code of Conduct. *Id.* at ¶¶ 34, 95. Plaintiff maintains that he was not put on notice that this meeting would be a hearing, because, while the Code of Conduct uses the terms "meeting" and "hearing" interchangeably, it refers to the former only twice, and the latter forty-eight times, and states that a student must attend a "meeting *or* hearing." *Id.* at ¶¶ 47-48, (emphasis added). The Code of Conduct does not define "hearing," but it states that hearings will be conducted in an "informal manner," including, "[d]iscussion, inquiry, persuasion, and other existing informal procedures." *Id.* at ¶ 35, 37. Plaintiff further alleges that he was provided insufficient advance notice of his hearing/meeting. *Id.* at ¶¶ 90-99. The Code of Conduct requires that students be provided with three days notice of any hearing, along with the time and place for such a hearing. *Id.* at ¶ 35.

On April 24, Plaintiff emailed UNC to schedule a meeting, and received a reply the same day asking if he was available to meet on the following Monday, April 27, at 11:00 a.m., but Plaintiff did not respond until after business hours, when he affirmed that the date and time suggested would work for him. Plaintiff received no reply until Monday morning, at 9:26 a.m., when UNC apologized for not confirming the appointment earlier and sent a calendar invite for the agreed upon time, which at that point was one hour and thirty-four minutes away. *Id.* at ¶¶ 90-99. A further requirement of the Code of Conduct is that Plaintiff submit a list of any witnesses or information in support of his defense twenty-four hours in advance of the hearing. *Id.* at ¶ 35. Plaintiff claims that he was not notified of this requirement, and that the lack of proper three-day notice rendered it impossible for him to submit any materials twenty-four hours in advance. *Id.* at ¶¶ 101-13.

At the meeting/hearing, Plaintiff was questioned by Colleen Sonnentag, the director of UNC's Office of Community Standards and Conflict Resolution. He did not have an opportunity to present witnesses, nor did he bring an advisor with him. *Id.* at ¶¶ 109-10. Plaintiff was issued a letter on May 1, 2020, finding him "Responsible" for violating the Code of Conduct. *Id.* at ¶ 111. As a part of this decision, Plaintiff was suspended until 2022, preventing his graduation, with his readmittance into UNC conditioned upon his compliance with disciplinary measures. UNC also placed a permanent note of his misconduct on his academic record. Plaintiff notes that the letter he received makes no reference to a hearing, and instead refers to the April 27 "meeting" five times. *Id.* at ¶¶ 112-14. When he later appealed this decision according to UNC's internal procedures, his appeal was denied, and UNC did not find that Plaintiff was deprived of the opportunity to submit favorable information, witnesses, and/or other evidence, nor that he was denied due process. *Id.* at ¶ 124-25.

Of concern to Plaintiff is the statistical disparities between men and women in regard to sexual misconduct claims and Title IX proceedings. Plaintiff alleges that there are no reported incidents of males lodging sexual assault claims against female students at UNC nor are there reports of female students being disciplined for sexual misconduct against males. *Id.* at ¶¶ 131-32. Furthermore, Plaintiff claims that UNC's polices and procedures are "set up to disproportionately affect the male student population as a result of the higher incidence of female complainants of sexual misconduct against male complainants of sexual misconduct." *Id.* at ¶ 137.

As part of his amended pleadings, Plaintiff cites to a newspaper article written in the *Greeley Tribune*, published in 2017, which was critical of UNC's Title IX process, and detailed the stories of two women who were unsatisfied with UNC's response to their allegations of rape. *Id.* at ¶¶ 182-87. The two stories both involved males as the accused, and in both cases the males

were found responsible, though their punishments were too light to satisfy their accusers. *Id.* Mr. Loften, who was the intake officer for Ms. Doe's accusations, investigated the cases reported on in the article, and he was quoted in the article as saying the "university needed to play catch-up." *Id.* at ¶¶ 191-95. Plaintiff notes that both of the males in the article were accused of more serious sexual misconduct than he, but received lighter punishments, as both were allowed to continue attending classes without a suspension. *Id.* at ¶¶ 198, 204. Plaintiff alleges that the article was meant to pressure UNC to more harshly punish males accused of sexual misconduct by females. *Id.* at ¶¶ 195-96. In addition to this article, Plaintiff alleges that UNC was under pressure by the federal government, in the form of the 2011 Dear Colleague Letter, which was a guidance document designed to change Title IX procedures and the handling of sexual misconduct cases in universities by threatening to withhold federal funding to non-compliant schools. *Id.* at ¶¶ 174-81. Plaintiff takes particular issue with the removal of a right to cross-examine the accuser, and the low-set "preponderance of evidence" burden of proof. *Id.* Plaintiff alleges that these two external factors exerted pressure on UNC to more harshly punish male perpetrators of sexual misconduct, and that UNC's response overcorrected to unfairly punish males accused of sexual misconduct.

Based on these facts, Plaintiff alleges that his sanction was incommensurately harsh, that UNC misapplied the "preponderance of evidence" standard, and that the procedural irregularities which he encountered, as well as his ultimate suspension, were motivated by anti-male gender discrimination in violation of both 42 U.S.C. § 1983 and his right to due process under the Fourteenth Amendment.

## LEGAL STANDARDS

### I.      Fed. R. Civ. P. 12(b)(1)

Rule 12(b)(1) empowers a court to dismiss a complaint for "lack of subject matter jurisdiction." Fed. R. Civ. P. 12(b)(1). Dismissal under Rule 12(b)(1) is not a judgment on the merits of a plaintiff's case, but only a determination that the court lacks authority to adjudicate the matter. *See Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir. 1994) (recognizing federal courts are courts of limited jurisdiction and may only exercise jurisdiction when specifically authorized to do so). A court lacking jurisdiction "must dismiss the cause at any stage of the proceeding in which it becomes apparent that jurisdiction is lacking." *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974). A Rule 12(b)(1) motion to dismiss "must be determined from the allegations of fact in the complaint, without regard to mere [conclusory] allegations of jurisdiction." *Groundhog v. Keeler*, 442 F.2d 674, 677 (10th Cir. 1971). The burden of establishing subject matter jurisdiction is on the party asserting jurisdiction. *See Basso*, 495 F.2d at 909. Accordingly, Plaintiff in this case bears the burden of establishing that this Court has jurisdiction to hear his claims.

Generally, Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction take two forms. *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995).

> First, a facial attack on the complaint's allegations as to subject matter jurisdiction questions the sufficiency of the complaint. In reviewing a facial attack on the complaint, a district court must accept the allegations in the complaint as true.
>
> Second, a party may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends. When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations. A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1). In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 motion.

*Id.* at 1002-03 (citations omitted).  The present motion to dismiss launches a facial attack on this Court's subject matter jurisdiction; therefore, the Court will accept the truthfulness of the Complaint's factual allegations.

## II.     Fed. R. Civ. P. 12(b)(6)

The purpose of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of a plaintiff's complaint. *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 2008). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that a plaintiff pleads facts that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. *Twombly* requires a two-prong analysis. First, a court must identify "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Iqbal*, 556 U.S. at 679–80. Second, a court must consider the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. If the allegations state a plausible claim for relief, then the claim survives the motion to dismiss. *Id.* at 680.

Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *S.E.C. v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014) (quoting *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012)). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 878 (10th Cir. 2017) (quoting *Kan. Penn*

*Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011)). Thus, while the Rule 12(b)(6) standard does not require a plaintiff to establish a *prima facie* case in a complaint, the elements of each alleged cause of action may help to determine whether the plaintiff has set forth a plausible claim. *Khalik*, 671 F.3d at 1191.

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. The complaint must provide "more than labels and conclusions" or merely "a formulaic recitation of the elements of a cause of action;" "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has made an allegation, "but it has not shown that the pleader is entitled to relief." *Id.*

## ANALYSIS

## I.   Sovereign Immunity of State Entities

Plaintiff's second cause of action against Defendant is brought pursuant to 42 U.S.C. § 1983. Defendant argues this Court has no jurisdiction over such a claim, because it is barred by sovereign immunity. The Court agrees. Interpreting the Eleventh Amendment, the Supreme Court has "consistently held that a [non-]consenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another state." *Edelman v. Jordan*, 415 U.S. 651, 662–663 (1974); *see Kentucky v. Graham*, 473 U.S. 159, 169 (1985) ("[A]bsent waiver by the State or valid congressional override, the Eleventh Amendment bars a damages action against a

9

State in federal court."). "Thus, the Eleventh Amendment bars a suit brought in federal court by the citizens of a state against the state or its agencies." *Johns v. Stewart*, 57 F.3d 1544, 1552 (10th Cir. 1995) (internal citation omitted). This immunity applies to suits arising under 42 U.S.C. § 1983. *Quern v. Jordan*, 440 U.S. 332, 335 (1979) ("[42 U.S.C. §] 1983 does not explicitly and by clear language indicate on its face an intent to sweep away the immunity of the States.").

"[W]hen the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants." *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 277 (1997) (quoting *Ford Motor Co. v. Dep't of Treasury of Ind.*, 323 U.S. 459 (1945)). In this case, Plaintiff does not seek monetary relief under this claim, but rather injunctive relief. The Supreme Court, in *Ex parte Young*, 209 U.S. 123 (1908), held that the Eleventh Amendment generally does not bar suits that "(i) seek only declaratory and injunctive relief rather than monetary damages for alleged violations of federal law, and (ii) are aimed against state officers acting in their official capacities, rather than against the State itself." *Hill v. Kemp*, 478 F.3d 1236, 1255–56 (10th Cir. 2007). In other words, to determine "whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645, (2002) (citations omitted).

Here, Plaintiff's seeks prospective, injunctive relief. ECF 28 at ¶ 259. This relief includes vacating Defendant's ruling on its investigation, expunging Plaintiff's student records, readmitting him into the University, destruction of any record of the complaint, and clearing his suspension from his record. *Id.* at 37. However, Plaintiff seeks that relief from a Colorado state entity rather

than from a state official acting in his or her official capacity. *Id.* Such a suit is barred by sovereign immunity and does not fall into the exception created by the *Ex parte Young* doctrine. The Tenth Circuit has addressed this question specifically in the context of state universities. *Buchwald v. University of N.M. Sch. of Med.*, 159 F.3d 487, 496 (10th Cir. 1998). "Thus, although the *Ex parte Young* exception does not permit plaintiff to subject [a state university], its Regents, or the Committee on Admissions to suit because they are state agencies, plaintiff may maintain an action against the individual defendants in their official capacities to the extent she seeks a prospective injunction ordering her admission into [a state university]." (emphasis added). *Id.* Because *Buchwald* so clearly settles this issue, the Court need not consider resolving the tension noted by Plaintiff in his response. ECF 37 at ¶ 9. To proceed on this claim, Plaintiff must name a state official in his or her official capacity. Because he has not done so, Plaintiff's claim is dismissed.

## II.    Gender Discrimination

Title IX reads that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal assistance." 20 U.S.C. § 1681(a). The analysis of private actions under Title IX, and who bears the burden of showing proof under different circumstances, has been something that many courts have grappled with in the wake of the 2011 Dear Colleague Letter. However, the Tenth Circuit has recently decided two cases which are remarkably similar to the case before the Court today. *Doe v. Univ. of Denver*, 952 F.3d 1182 (10th Cir. 2020) (hereinafter, "*Doe I*"); *Doe v. Univ. of Denver*, __ F.3d __, No. 19-1359, 2021 WL 2426199 (10th Cir., 2021) (hereinafter, "*Doe II*").

In both cases, male students were accused of sexual misconduct by a female student. Both male students alleged their innocence but were sanctioned by their university after going through

proceedings with differing degrees of irregularity to them. In both cases, the plaintiffs claimed that external and internal pressure caused the university to sanction male students too harshly, and alleged gender discrimination under 42 U.S.C. § 1983. *Doe I* was decided against the plaintiff, and the court held that evidence of procedural irregularities, external pressure, statistical imbalances, and an unjustified, unfavorable outcome, was not enough to prove gender discrimination without "something more" in order to overcome the argument advanced by the university that these were only evidence of anti-respondent bias, and not anti-male bias. *Doe I*, 952 F.3d at 1192-93. In contrast, *Doe II* was decided for the plaintiff, and the court found that the "something more" required by *Doe I* was satisfied by blatantly imbalanced Title IX proceedings, and prejudiced statements and attitudes expressed by university representatives. *Doe II*, 2021 WL 2426199 at *17-18. *Doe II* also reaffirmed the burdens of the parties under a Title IX claim going forward. *Id.*

In analyzing a Title IX claim, the court must follow the three-step *McDonnell Douglas* burden shifting test. *Id.* at *13; *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1315 n.8 (10th Cir. 2017) (holding that the *McDonnell Douglas* test applies to both Tile VII and Title IX cases). The first step for this test requires a plaintiff to show a prima facie case for discrimination. In this context, this step is satisfied if a plaintiff shows, by way of an erroneous outcome, selective enforcement, or some other evidence, that sex was a motivating factor in the university's disciplinary decision. *Id.* In response, the burden shifts to a defendant to show that there is a "legitimate, nondiscriminatory reason for its decision." *Id.*, (citing *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000)). In both *Doe I* and *Doe II*, this legitimate, nondiscriminatory reason was anti-respondent bias. *Id.* If such an alternate reason is shown, the burden shifts back to a plaintiff to show "a genuine issue of material fact as to whether the proffered reason is pretextual." *Id.* "[A] plaintiff can establish pretext by showing the defendant's proffered

nondiscriminatory explanations for its actions are so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude they are unworthy of belief." *Hiatt*, 858 F.3d at 1316 (10th Cir. 2017) (alteration in original) (quoting *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010)).  In the context of a Title IX claim, a blatantly imbalanced proceeding may suffice to prove that a reason is pretextual, but mere procedural irregularities do not. *Compare Doe II*, 2021 WL 2426199 at *19, *with Doe I*, 952 F.3d at 1198.

Although the *McDonnell Douglas* test arose in the context of summary judgment, it has been harmonized with the appropriate pleading standard for Rule 12(b)(6) motions. "[I]t appears that taking the tenants of *Twombly* and *Iqbal* and the *McDonnell Douglas* framework together, a plaintiff alleging a Title IX erroneous outcome case needs to provide 'at least some relevant information to make the claims plausible on their face.'" *Norris v. Univ. of Colo.*, 362 F. Supp. 3d 1001, 1011 (D. Colo. 2019), (quoting *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012)).

### a.   Was sex a motivating factor in UNC's disciplinary decision?

Plaintiff satisfies his initial burden under the *McDonnell Douglas* framework. As discussed in *Doe II*, the first step of that test requires Plaintiff to show that sex was a motivating factor in UNC's disciplinary decision. More directly, "do the facts alleged, if true, raise a plausible inference that the university discriminated against [Plaintiff] on the basis of sex?" *Doe II*, 2021 WL 2426199, at *15 (internal quotations omitted) (quoting *Doe v. Purdue Univ.*, 928 F.3d 652, 667-68 (7th Cir. 2019)). Plaintiff here alleges that UNC's Title IX procedures came to an erroneous outcome based upon the admissions and inconsistencies of Ms. Doe's complaint, and the apparent anti-male bias demonstrated by UNC, and further alleges that the punishment meted out to him was incommensurately and inconsistently harsh. "[E]vidence of an erroneous outcome [is] means by

which a plaintiff might show that sex was a motivating factor in a university's disciplinary decision." *Id.* at *15-16. While this is not the only way to prove that gender was a motivating factor in UNC's disciplinary decision, it is the primary argument advanced by Plaintiff.

In *Doe II*, the Tenth Circuit recognized that an erroneous outcome could provide evidence of *prima facie* discrimination, so long as (1) the facts alleged are sufficient to cast articulable doubt on the accuracy of the outcome, and (2) there is a particularized causal connection between the outcome and gender bias. *Id.* at *14. In *Doe II*, the plaintiff was able to satisfy this burden by pointing to facts or alternative leads which the university did not consider in their investigation. *Id.* at *18. Here, Plaintiff alleges that UNC failed to consider that Ms. Doe admitted in her text that "it was consensual because he asked permission for most stuff," and that her testimony was inconsistent. ECF 28 at ¶ 80. Similar allegations were strong enough to satisfy this burden in *Doe I* (though the court in that case did not state it expressly). *Doe II*, 2021 WL 2426199 at *13 n.4 (noting that *Doe I*'s plaintiff failed to carry his burden at the third step of the *McDonnell Douglas* framework, and thus implicitly met the burden at the first step). Plaintiff's allegations are also sufficient at this stage to infer a causal connection between the erroneous outcome gender bias, given the vast discrepancy in numbers between male and female respondents in UNC's Title IX proceedings, as well as the alleged external pressure exerted on UNC. "It is precisely because procedural irregularity alone already suggests bias that even minimal evidence of sex-based pressure on the university is sufficient to establish bias on account of sex." *Id.* at *18 (quoting *Doe v. Oberlin Coll.*, 963 F.3d 580, 586-588 (6th Cir. 2020)). Because Plaintiff plausibly alleges facts sufficient to meet the two prongs of erroneous outcome analysis, he satisfies his burden under the first step of *McDonnell Douglas*.

### b. Was there a legitimate, nondiscriminatory alternate reason for the decision?

Defendant argues in its Motion that any argument put forward by Plaintiff is consistent with an alternate, nondiscriminatory explanation of its decision. Namely, that if any bias was exhibited by UNC, or experienced by Plaintiff, it was bias against respondents to sexual misconduct claims, rather than bias against males, a claim familiar from *Doe I* and *Doe II*. Those cases dealt with the same alternate reason for the disciplinary decision, and held that while reprehensible, such bias was not discriminatory under Title IX, and therefore an acceptable alternative under the *McDonnell Douglas* framework. *Id.* at *16 ("'[E]vidence of a school's anti-respondent bias,' we explained, 'does not create a reasonable inference of anti-male bias,' because both males and females can be respondents.") (citing *Doe I*, 952 F.3d at 1196). This alternate, nondiscriminatory explanation is sufficient to carry the burden under *McDonnell Douglas*'s second step.

### c. Is there genuine issue that the alternate reason is pretextual?

The third step in the *McDonnell Douglas* framework requires Plaintiff to show that the alternate non-discriminatory reason proffered by UNC was pretextual. In order to satisfy this burden, Plaintiff must show that "a genuine issue of material fact as to whether the proffered reason is pretextual." *Kendrick*, 220 F.3d at 1226. It is at this step in the framework where *Doe I* and *Doe II* diverge, and indeed, where many Title VII and Title IX cases hinge. Plaintiff's arguments fall under two broad categories: procedural irregularities and factors outside UNC's control. Each category will be addressed in turn.

#### i. Procedural Irregularities

Plaintiff alleges a slew of procedural irregularities that he claims are evidence of anti-male gender discrimination. However, these irregularities are less pronounced than those considered

acceptable by *Doe I*, and certainly less than those overturned as discriminatory in *Doe II*. Among Plaintiff's allegations, he lists,

> (i) Defendant failed to afford Plaintiff a hearing on the charges against him; (ii) Defendant failed to provide Plaintiff proper notice; (iii) Defendant deprived Plaintiff the opportunity to present favorable evidence; (iv) Defendant evidenced a gender bias against Plaintiff throughout the investigative process as a male student accused of sexual misconduct; (v) Defendant made assessments of credibility and evidentiary weight with respect to each party and witness without ascertainable rationale or logic; and (vi) Defendant failed to properly apply the standard of proof; and (vii) Defendant failed to utilize an adequate standard of review."

ECF 28 at ¶ 13. The court will address each of these seven allegations in turn.

First, Plaintiff maintains that his hearing/meeting with the Hearing Officer was frequently characterized only as a "meeting" and that this misled him into presumably believing that he would have an additional, separate, "hearing." However, the Code of Conduct states that "the procedure will normally be conducted in an informal manner. Discussion, inquiry, persuasion, and other existing informal procedures will normally be used." ECF 28 at ¶ 35. This clause should have put Plaintiff on notice that his "hearing" would not be a mirror image to a "hearing" in the legal sense of the word. Plaintiff alleges that "a reasonable person would expect different consequences of a meeting versus a hearing" and "a reasonable person would interpret the [Code of Conduct] to mean that a meeting and a hearing are not one and the same." The Court is not bound by these conclusory allegations. *Iqbal*, 556 U.S. at 679–80. Based on the guidelines and rules set up in the Code of Conduct, Plaintiff received a "hearing" as it is contextually understood in the Code of Conduct, regardless of whether it met Plaintiff's expectations for a hearing. The use of interchangeable labels for the meeting/hearing may be a poor and confusing practice, but it is not evidence of gender discrimination or anti-male bias without some evidence that such practices are not used for female students or are in some way inconsistent with other proceedings.

Second, Plaintiff alleges that UNC failed to provide him proper notice of the April 27 hearing/meeting. The Code of Conduct states, "[t]he student . . . subject to disciplinary action will be informed at least three (3) days prior to the hearing of a summary of the alleged behavior and code of conduct violation and the time and place of the hearing." ECF 28 at ¶ 35. Plaintiff was not provided final confirmation of his meeting/hearing until the day it was set to occur. ECF 28 at ¶¶ 90-99. Although this may be a poor practice, it does not work to support Plaintiff's claims. While final confirmation was not provided until April 27, Plaintiff was contacted on April 24 regarding his availability on April 27 at 11:00 a.m. Plaintiff responded to say that he was available, but not until after business hours on April 24, which was a Friday. *Id.* Plaintiff cannot have expected UNC to change the requested time of the meeting/hearing after that point, once he had agreed to the date and time. If Plaintiff had been concerned by the lack of suitable notice, he was within his rights to request a later date and time, but he did not do so. Further, Plaintiff is correct in asserting that he was not provided any notice of the location until the day of his hearing/meeting. However, Plaintiff does not allege any disadvantage or inconvenience this *location* caused him. Most critically, Plaintiff makes no plausible allegation that this failure of notice was in any way motivated by anti-male bias.

Next, Plaintiff alleges that, as a result of the lack of notice, he was denied the right to present favorable evidence on his own behalf. There are two flaws in this argument. First, Plaintiff could have reasonably assumed that the meeting was going to occur on April 27 after he confirmed his availability to UNC on April 24, which would have given him time to submit materials and witnesses ahead of the twenty-four-hour deadline required by the Code of Conduct. Second, Plaintiff does not identify a shred of evidence or a single witness which he would have listed and presented in his defense if given the opportunity, nor even that such evidence and witnesses exist.

In *Doe II*, the plaintiff was able to identify multiple witnesses and pieces of evidence which the university did not interview or consider, even though it considered similar evidence presented by the plaintiff's accuser. *Doe II*, 2021 WL 2426199 at *20-21. That is not the case here. Plaintiff makes no allegation which indicates that, had he attempted to present witnesses or other materials in his defense, UNC would have prevented him from doing so. Viewed in a light most favorable to Plaintiff, his allegations show, at most, an unfortunate administrative error.

Plaintiff's fourth and fifth arguments are implausible and conclusory. The general, conclusory statement that Defendant evidenced a gender bias throughout the proceedings must be supported by other allegations of procedural deficiencies and cannot stand on its own. To the point that Plaintiff's fourth argument is supported by statistical evidence of bias, see Section II(c)(ii) of this order below. Plaintiff's fifth argument is similarly conclusory and amounts to little more than Plaintiff's disagreement with the outcome of UNC's investigation. Plaintiff does not specify which statements or evidence are given improper weight, whether that weight was too great or little, nor what the proper weight of evidence and assessment of credibility should have been. The Court need not consider such vague and general allegations as true. *Iqbal*, 556 U.S. at 679–80.

Finally, Plaintiffs' sixth and seventh arguments relate to the standard of review applied in UNC's investigation. As a general matter, the application of a "preponderance of evidence" standard of proof to Title IX claims is not inherently discriminatory, nor is it a violation of Plaintiff rights. "[D]ue process permits state education institutions . . . to adjudicate sexual misconduct disciplinary proceedings according to a preponderance-of-the-evidence standard." *Lee v. Univ. of New Mexico*, No. 17-1230, 2020 WL 6743295 (D.N.M. Nov. 16, 2020). Plaintiff points to no authority which requires any different standard of proof. If it reflects any bias to apply such a low standard of proof, that bias is explainable by UNC's proffered alternate reason of anti-respondent

bias, because the standard is uniform regardless of whether a male or a female is accused. Plaintiff also argues that UNC failed to properly apply its own standard. This allegation mirrors the arguments made in *Doe I*, in which the Plaintiff asserted that there was so little evidence to support the decision of the university that it was reasonable to infer bias. *Doe I*, 952 F.3d at 1197-98 ("We assume, without deciding that . . . an inference of bias arises when an evaluator's decision in favor of one side lacks an apparent, evidence-based reason, and the evidence substantially favors the other side . . . is correct. But that proposition has no application here. Simply put [the university's] investigators were not faced with a situation in which the evidence substantially favored Plaintiff.") (citing *Doe v. Columbia University*, 831 F.3d 46 at 57 (2d Cir. 2016)). Because there was some evidence in the investigation relied upon by investigators, *Doe I* held "it would not be plausible or reasonable to infer merely from the investigators' weighing of the evidence that they were biased." *Id.* To contradict this observation, Plaintiff treats Ms. Doe's text to her friend stating "it was consensual" as a sort of smoking gun, ignored by UNC. However, this is a very limited view of what that text expressed. The full text quoted by Plaintiff states: "Like it was consensual because he asked for permission for most stuff but idk dude part of me was like [sic] let's see where this goes maybe there will be a connection." *Id.* at ¶¶ 79-80. One possible reading of this text, and apparently, the interpretation held by UNC, was that "permission for most stuff" necessarily means that there was not permission for *some* "stuff." In that light, the text does not conclusively show that Plaintiff was innocent, as would be necessary to infer bias from a decision to the contrary. It is clear that there was at least some evidence which UNC relied on to make its decision, and so the Court cannot infer bias (specifically, anti-male bias) from its decision.

The procedural irregularities alleged by Plaintiff are insufficient to overcome the alternate theory of anti-respondent bias put forward by UNC. Absent some allegations or evidence of

disparate procedures between males and females, UNC's alternate explanation survives Plaintiff's arguments of procedural irregularities.

### ii.  External Pressure and Statistical Gender Disparity

Plaintiff alleges that external pressure placed on UNC by a local newspaper article and the 2011 Dear Colleague Letter provide evidence to believe that UNC was biased against males. Plaintiff further argues that the wide statistical disparity of males and females disciplined through the Title IX process is proof of anti-male bias. The Tenth Circuit has firmly rejected both categories of argument.

In *Doe I*, the university had been the subject of two investigations by the Department of Education focusing on Title IX proceedings, as well as being pressured by the same 2011 Dear Colleague Letter. *Doe I*, 952 F.3d at 1192-93. On both fronts, the Tenth Circuit rejected the notion that these arguments could prove that the university's anti-respondent bias claim was pretextual. "[E]vidence that a school felt pressured to conform with its guidance cannot alone satisfy Title IX's fundamental requirement that the challenged action be on the basis of [gender]." *Id.* (internal quotations omitted); *see also*, *Doe II*, 2021 WL 2426199 at *17-18 ("[E]xternal pressure alone is not enough to state a claim that the university acted with bias in this particular case.") (quoting *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018)).

Regarding statistical evidence, *Doe I* held, in the face of an alternate explanation of anti-respondent bias by the university, that "[w]hen the statistical evidence does nothing to eliminate these obvious, alternative explanations for the disparity, an inference that the disparity arises from gender bias on the part of the school is not reasonable." *Doe I*, 952 F.3d at 1194.

> A factfinder could not reasonably infer from bare evidence of statistical disparity in the gender makeup of sexual-assault complainants and respondents that the school's decision to initiate proceedings against respondents is motivated by their gender. This is so because, at least in the discrimination context, the extent to which

> a discriminatory motive may be reasonably inferred from evidence of statistical disparity often depends on the evidence's ability to eliminate obvious nondiscriminatory explanations for the disparity.

*Id.* (citing *Luster v. Vilsack*, 667 F.3d 1089, 1094 (10th Cir. 2011)). The plaintiff in that case also highlighted the gender make-up of complainants and respondents, which evidenced a disparity much like the one at issue here. *Id.* While *Doe II* found some statistical arguments by the plaintiff in that case persuasive, this is because those statistics referred to the gender disparity in the university's *response* to sexual misconduct claims, rather than the sheer number and gender make-up of claims brought. *Doe II,* 2021 WL 2426199 at *27-28. That court found that those statistics were different when compared to the arguments in *Doe I* because "these sex disparities are not 'almost completely beyond the control of the school.'" *Id.* (citing *Doe I*, 952 F.3d at 1194). Furthermore, the court noted that the university's practices, according to those statistics, were not consistent with its pro-complainant, anti-respondent position. Here, Plaintiff's arguments based upon statistics cannot be said to concern matters within the control of the school, nor are they inconsistent with an anti-respondent bias, and so they are more akin to the arguments in *Doe I* than *Doe II*.

Referring to both statistical evidence and external pressure, the court in *Doe II* remarked, "this type of generalized evidence, standing alone, cannot satisfy a Title IX plaintiff's summary judgment burden." *Id.* at *17. Understanding that a motion to dismiss is before the Court, rather than a motion for summary judgment, the Court finds, based on *Doe II*, that Plaintiff's "generalized evidence" is insufficient to support the harmonized burdens of *McDonnell Douglas*, *Iqbal* and *Twombly*. *Norris v. Univ. of Colo.*, 362 F. Supp. 3d 1001, 1011 (D. Colo. 2019) (requiring a plaintiff to provide "at least some relevant information to make the claims plausible on their face"). Although *Doe II* was decided after this case was filed, Plaintiff may not rely on arguments that

were rejected by the Tenth Circuit to overcome his burden to prove that the anti-respondent bias of UNC is a pretextual alternate explanation for the disciplinary decision.

Even taking Plaintiff's allegations as true, which the Court must, none of the allegations put forward by Plaintiff show "a genuine issue of material fact as to whether the proffered reason is pretextual." *Kendrick*, 220 F.3d at 1226. Plaintiff's allegations do not implicate any gender specific evidence of bias. All procedural irregularities, external pressures, and statistical discrepancies can be explained by the obvious alternate explanation put forward here by UNC and relied upon by other universities in other cases. As troubling as it may be that UNC is apparently willing to embrace the explanation of anti-respondent bias, that bias is neither illegal nor discriminatory when it comes to Title IX's prohibition on gender discrimination. *Doe I*, 952 F.3d at 1201 n.18.

## III.    Leave to Amend

Tenth Circuit precedent holds that "dismissal with prejudice is proper for failure to state a claim when 'it is obvious that the plaintiff cannot prevail on the facts he has alleged and it would be futile to give him the opportunity to amend.'" *Fleming v. Coulter*, 573 F. App'x 765, 769 (10th Cir. 2014) (quoting *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 806 (10th Cir. 1999)).  Here, the Court does not believe that allowing amendment would necessarily prove futile.  For instance, Plaintiff may be able to supplement its proffered statistical allegations to show that the University does not respond equally to complaints from males and females, or that there were specific witnesses and evidence excluded by Plaintiff's lack of notice. Plaintiff may also reassert his claim for prospective injunctive relief against a state official. Therefore, in the interest of justice and for lack of obvious futility, the Court *sua sponte* grants Plaintiff leave to amend his pleading.

**CONCLUSION**

Based on the Tenth Circuit's decisions in *Doe I* and *Doe II*, Plaintiff's allegations may show (and UNC may admit) that UNC's procedure was not favorable to him, but the investigation's irregularities and unfavorable outcomes are consistent with UNC's explanation that it exhibits anti-respondent bias, rather than anti-male bias. Plaintiff's first claim is insufficiently pleaded to carry his burden under the *McDonnell Douglas* framework and does not prove discrimination under Title IX. Plaintiff's second claim is barred by sovereign immunity under the Eleventh Amendment.

ACCORDINGLY, Defendant's Motion to Dismiss Amended Complaint [filed May 25, 2021; ECF 36] is **granted**. Plaintiff's claims are dismissed without prejudice, and Plaintiff is given leave to amend.

Entered this 6th day of July, 2021, at Denver, Colorado.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge