**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:20-cv-03271

TORRENCE BROWN-SMITH,

     Plaintiff,

v.

ANDREW FEINSTEIN, in his official capacity as President of the University of Northern Colorado,

     Defendant.

---

**SECOND AMENDED COMPLAINT**

---

     Torrence Brown-Smith, Plaintiff, through his attorneys, Cheney Galluzzi & Howard, LLC, files the following Second Amended Complaint against Defendant, Andrew Feinstein, President of the University of Northern Colorado ("UNC"), in his official capacity.

**INTRODUCTION**

1. This case is about a Black male student who was denied due process and fair treatment in UNC's investigation of false allegations of non-consensual sexual activity that were made against him. That student, the Plaintiff, brings this action to rectify the harm done by UNC's unlawfully inadequate procedures, unfounded findings, and excessively harsh sanctions.

2. Torrence Brown-Smith, Plaintiff, was enrolled at UNC. He was set to graduate in May 2020. As the Black Student Union President, a Ronald E. McNair Scholar, and a

sociology researcher, he was an avid student and well-respected on campus. Unfortunately, Plaintiff was falsely accused of sexual misconduct.

3. In response to this accusation, Defendant UNC deprived Plaintiff of his student rights by repeatedly violating Defendant's own Student Code of Conduct (the "UNC Student Code" or the "Code"). Defendant's actions included a pre-determined conclusion that Plaintiff violated the Code, an inadequate investigation, failure to abide by Defendant's own due process procedures, failure to provide a hearing, failure to properly apply the standard of proof, and the imposition of excessively harsh sanctions.

4. Defendant's inadequate implementation and enforcement of its policies, and its failure to follow the correct investigatory, notice, and adjudicatory procedures, resulted in the deprivation of Plaintiff's due process rights.

5. The allegations underlying the actions taken by Defendant concern an instance of consensual sexual activity that occurred during the evening of February 7, 2020 (the "Encounter"), between Plaintiff and Jane Doe ("Ms. Doe")[1], a fellow UNC student.

6. Ultimately, on May 1, 2020, Hearing Officer Colleen Sonnentag, Director of UNC Community Standards and Conflict Resolution ("CSCR"), sent Plaintiff a letter notifying him that he had been found responsible for violating UNC's Student Code (the "Decision").

---

[1] Plaintiff refrains from disclosing Jane Doe's identity herein because she is not a party to this action.

7. UNC assessed an excessively harsh penalty, including, but not limited to, suspension until 2022 (the "Sanction"), preventing Plaintiff from graduating as he was set to do in May 2020.

8. Throughout the investigation and adjudication, Defendant UNC repeatedly failed to abide by UNC's own guidelines and regulations and acted in direct violation of federal and/or state law, including but not limited to: (i) Defendant failed to afford Plaintiff a hearing on the charges against him; (ii) Defendant failed to provide Plaintiff proper notice; (iii) Defendant deprived Plaintiff the opportunity to present favorable evidence; (iv) Defendant made assessments of credibility and evidentiary weight with respect to each party and witness without ascertainable rationale or logic; and (v) Defendant failed to properly apply the standard of proof; and (vi) Defendant failed to utilize an adequate standard of review.

9. When Defendant subjected Plaintiff to disciplinary action, it did so in an arbitrary and capricious way and failed to follow appropriate disciplinary measures.

10. Plaintiff has been greatly damaged by Defendant's actions.

11. His education and career prospects have been severely compromised as he now is functionally unable to gain admission to another university to obtain his degree and has lost the investment of the significant monies spent on obtaining a college education at UNC.

12. In addition to the damages sustained by Plaintiff, including his inability to continue his education and receive his degree, Plaintiff has sustained tremendous damages to

his future education, career prospects, and reputation as a result of the Decision and Sanction.

13. Plaintiff therefore brings this action to obtain relief for violations of his right to due process.

## THE PARTIES

14. Plaintiff is a twenty-two-year-old resident of Greeley, Colorado. At all times relevant to this action, he was an active student at UNC.

15. Defendant Andrew Feinstein serves as the President of UNC. Dr. Feinstein is responsible for making certain business and policy decisions for UNC and has authority over student enrollment and actions by the University.

16. Plaintiff and Defendant are sometimes hereinafter collectively referred to as the "Parties."

## JURISDICTION AND VENUE

17. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because the claim arises under the Constitution and statutes of the United States.

18. This Court has personal jurisdiction over Defendant on the grounds that he resides in Colorado and is President of a University that is conducting business within the State of Colorado.

19. Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because Defendant is considered to reside in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

I.    *Agreements, Representations, Covenants & Warranties between Plaintiff and the University*

20. Plaintiff has lived in Colorado off and on his whole life. He completed high school at Gateway High School in Aurora, Colorado. In high school, Plaintiff discovered his love of writing and a passion for social justice. Plaintiff decided as a teenager that he wanted to go to college to study sociology, earn an advanced degree, and put his education to use advancing the rights and causes of all peoples.

21. Plaintiff applied to and was accepted by UNC in Greeley, Colorado. Plaintiff was in the UNC Class of 2020.

22. At UNC, Plaintiff blossomed academically and as an active student. He became the Black Student Union President, a Ronald E. McNair Scholar, and worked in sociology research while earning his degree.

23. Plaintiff was set to graduate with a Bachelor's Degree in Sociology in May 2020. Plaintiff had been accepted into a Ph.D. program at the University of Cincinnati.

24. During Plaintiff's time at UNC, UNC Student Code of Conduct (Revised 5/5/2010) (the "UNC Student Code") was in effect.

25. The Code prohibits the following misconduct:

1. "……
2. ……
3. Physical abuse, verbal abuse, threats, intimidation, coercion, and/or other conduct which threatens or endangers the health or safety of any person, including one's self.
4. ……
5. Harassment, which consists of any verbal, visual, written or physical conduct that is sufficiently severe, persistent or pervasive that it adversely affects, or has

the purpose or logical consequence of interfering with an individual's education or creates an intimidating, hostile or offensive environment.

    a. Sexual Harassment, which includes, but is not limited to non-consensual verbal or physical conduct related to sex which unreasonably interferes with an individual's work or educational performance or creates an intimidating, hostile, or offensive work, educational, or social environment; or is a violation of an individual's privacy.

6. Sexual Misconduct, which is defined as:

    a. Sexual contact that is without consent by any party. It is the obligation of any person to obtain active consent from the other person prior to sexual contact. Examples of misconduct include, but are not limited to, touching another's genitals/breasts without consent; having sexual contact with someone whose decision making ability is compromised (e.g. from alcohol or drug usage); or continuing sexual activity after either party has made it clear, either verbally or by conduct, that they do not wish to have physical contact." UNC Student Code of Conduct, § III. B.

26. According to the Code, students "who violate the University standards of conduct . . . are subject to disciplinary action. The University **has designed hearing procedures that aim to engage students . . . in a fair**, educational, and developmental **process**." *Id.* § IV (emphasis added).

27. According to the UNC Student Code (Revised 5/5/2010), the relevant procedures for "University Hearings" include:

1. When a disciplinary case is referred to or acted upon by the Chief Disciplinary Officer or designee, the procedure will normally be conducted in an informal manner. Discussion, inquiry, persuasion, and other existing informal procedures will normally be used. **The student . . . subject to disciplinary action will be informed at least three (3) days prior to the hearing of a summary of the alleged behavior and code of conduct violation and the time and place of the hearing.** Pending such action, the student or recognized student organization has the right to be present on campus, attend classes, or conduct organizational business except in cases of interim suspension.

2. . . .

3. The **student or recognized student organization must submit to the Hearing Officer a list of any witnesses and/or information for review 24 hours prior to the scheduled hearing**.

4. The **University Hearing Officer shall conduct the hearing.** The Hearing Officer, in keeping with fair and reasonable guidelines, may impose limits upon the number of witnesses and the amount of information that may be introduced where proffered information is cumulative, redundant or immaterial. Rules of evidence and rules of procedure do not apply. **Reasonable rules on relevancy and fairness will guide the Hearing Officer in determining the admissibility of information.** In every case, the facts are to be reviewed and decisions made based upon a preponderance of evidence. **The burden of establishing the basis for any disciplinary action shall be on the University.**

5. . . .

6. . . .

7. The University Hearing Officer shall serve as the deciding body and shall impose sanctions as appropriate." *Id.* § IV (emphasis added).

28. The Code provides poor notice and explanation regarding the distinctions between a "hearing" or a "meeting" during the investigatory process.

29. The UNC Student Code does not define "hearing".

30. The UNC Student Code indicates the possibility of "a meeting or hearing as part of the Student Conduct System".

31. The UNC Student Code indicates students have a duty to obey a notice from a University Hearing Officer or designated University Official "to appear for a meeting or hearing as part of the Student Conduct System."

32. The UNC Student Code, by instructing students to obey a notice from a University Hearing Officer or designated University Official to appear for "a meeting or hearing" as part of the Student Conduct System, differentiates between a meeting and a hearing without defining either.

33. The UNC Student Code does not explain that a meeting and a hearing seem to be, for all intents and purposes, one and the same.

34. Meeting is not a legal term. A meeting is an act or process of coming together.

35. A hearing is opportunity to be heard, to present one's side of a case, or to be generally known or appreciated.

36. A reasonable person would expect different consequences of a meeting versus a hearing.

37. A reasonable person would interpret the UNC Student Code to mean that a meeting and a hearing are not one and the same.

38. A reasonable person would interpret the UNC Student Code to mean that an accused student shall receive a hearing.

39. The UNC Student Code refers to the word "hearing" 48 times.

40. The UNC Student Code refers to the word "meeting" 2 times.

41. UNC University Hearings under the Code must be consistent with provisions of the UNC Student Code.

## II.   *The night of February 7, 2020 (the "Incident")*

42. On February 6, 2020, Jane Doe posted a picture of herself on Snapchat, and Plaintiff commented on the photo telling her that he found her attractive. Ms. Doe replied to Plaintiff that she found him attractive, as well.

43. On February 7, 2020, Ms. Doe and Plaintiff both attended the Black Student Union meeting on UNC's campus.

44. Plaintiff and Ms. Doe continued to send messages to one another and arranged to hang out after the meeting, to "maybe grab tea," but did not set a "definitive destination."

45. Following the meeting, they initially went to High Brau Taphouse. Ms. Doe saw her former professor and spoke with him and met his wife. Plaintiff and Ms. Doe left after about ten

minutes because the bar did not have tea. The two of them did not consume any alcohol that evening.

46. Plaintiff and Ms. Doe then drove to John Galt Coffeehouse Co. While at John Galt, Plaintiff and Ms. Doe played a card game called "Truth or Dare UNO!" It is played like "Truth or Dare," and during their time at John Galt they "did a lot of dares," which Plaintiff described as "more open-ended questions" than actual dares; he estimated that they had a ten-to-twelve minute conversation after each "dare."

47. While they were playing Uno Dare at John Galt, Ms. Doe told him about her previous sexual experiences including "threesomes" and "kinky sex." Ms. Doe also asked Plaintiff what he liked during sex.

48. Plaintiff and Ms. Doe left John Galt around 9:55 pm. Plaintiff then invited Ms. Doe to visit his off-campus residence to continue their conversation and watch a movie. Ms. Doe agreed and stated that she wanted popcorn.

49. Plaintiff then drove Ms. Doe to the Cinemark Greeley Mall where they purchased popcorn. When they arrived at his residence, they immediately went into his bedroom.

50. Ms. Doe initially sat down in the chair and Plaintiff was laying down on his bed, with his head toward the middle of the length of the bed. After a little while, Ms. Doe joined Plaintiff on his bed.

51. After a while, Plaintiff asked her if she wanted "to cuddle, as friends"; She said "okay" and they began to cuddle, and she fell asleep.

52. When Ms. Doe woke up, Plaintiff asked if he could kiss her; Ms. Doe said "I guess." Plaintiff started to kiss Ms. Doe at this point.

53. Plaintiff and Ms. Doe then kissed, which included passionate French-kissing. Ms. Doe's hands were on Plaintiff's shoulder and chest. One of his hands was around her waist and the other was around her back.

54. They both stopped kissing, Ms. Doe laughed, asked for water, and told him that she had to be careful because she could "go up a level." She also told him that he had soft lips. The two of them then continued kissing.

55. Plaintiff then got on top of Ms. Doe and, consistently with Ms. Doe's previously-stated preference for "kinky sex,"  Plaintiff put his hand on Ms. Doe's neck and put pressure on the sides of her neck so as not to put pressure on the front of her throat or cut off access to breathing. Plaintiff believed he was delivering the sexual activities that Ms. Doe preferred.

56. Plaintiff describes this sort of sexual choking action as lasting "not that long," and he stopped this action while the two of them were still engaged in kissing.

57. It appeared to Plaintiff that he had consent for this action because of their previous conversations about Ms. Doe's stated sexual preferences, her stated prior experience with "kinky sex," and their active engagement in sexual activity.

58. Plaintiff stopped that action and moved on from it on his own, and Ms. Doe did not address it that night. Ms. Doe did not say anything to Plaintiff at the time about the strangling action. They continued to engage in kissing.

59. The two of them then stopped kissing again, and Ms. Doe giggled; they then continued to kiss.

60. According to Plaintiff, he put his hand down Ms. Doe's pants and digitally penetrated her with her consent based on her body cues and the way she was reacting coupled with the rest of the context of their evening.

61. As Plaintiff put his hand down Ms. Doe's pants as they were kissing, Ms. Doe did not tell him to stop nor attempt to move his hand.

62. Ms. Doe sat up and told Plaintiff that she did not want things to progress further "because she wouldn't be able to stop herself if things heated up more." Plaintiff stopped and withdrew his hand from her pants.

63. There is no dispute that Ms. Doe did not say anything about pain or hurting to Plaintiff.

64. There is no dispute that when Ms. Doe sat up and "told Plaintiff she did not want things to progress further," Plaintiff stopped.

65. There is no dispute that when Ms. Doe told Plaintiff she did not want to keep going, it was because she "wouldn't be able to stop herself," not that she did not like Plaintiff or did not like what he was doing.

66. Plaintiff then tried to kiss Ms. Doe once more and acted like he would "go down on her." Ms. Doe laughed, and Plaintiff then stopped.  He stopped because he did not know what her laughing meant and sensed that he did not have consent to continue.

67. Ms. Doe did not say anything to Plaintiff to indicate that she did not enjoy their sexual activity.

68. Ms. Doe asked Plaintiff for a ride back to her car. Plaintiff gave Ms. Doe a ride back to her car. When Plaintiff dropped Ms. Doe back at her car, he told her he was going to "break her back," an allusion to high-quality sexual performance that, based on the evening, he thought would be something along the lines of welcome flirtation.

69. Plaintiff asked Ms. Doe to text him once she got home.

70. Ms. Doe did text Plaintiff or message him to let him know that she made it home.

71. The next day, Ms. Doe texted her friend about the Incident with Plaintiff. Ms. Doe appeared to regret the Incident.

72. Ms. Doe stated: "Like it was consensual because he asked permission for most stuff but idk dude part of me was like let's just see where this goes maybe there will be a connection ......"

73. Ms. Doe admits that the Incident was consensual.

74. Ms. Doe never told Plaintiff no or gave him a verbal indication that she did not want to proceed.

75. When Plaintiff asked for permission, permission was given.

76. When Ms. Doe asked Plaintiff to stop, Plaintiff stopped.

77. Nonetheless, in the days after the Incident, Ms. Doe felt uncomfortable and reported the interaction on campus during a walk-in intake appointment.

**III.**   *The University's Inadequate Investigation and Lack of Meaningful Hearing*

78. Ms. Doe reported the Incident during a walk-in interview with UNC Title IX Coordinator Larry Loften on February 11, 2020. According to Ms. Doe, Plaintiff "kissed her, choked her, touched the exterior of her genitals, and penetrated her vagina digitally"—all "without her consent."

79. Plaintiff received a Notice of Investigation on February 12, 2020.

80. Plaintiff met with UNC Investigator James Kohles on February 14, 2020.

81. On March 12, 2020, UNC sent Plaintiff a "Draft Investigation Report." The Report summarized facts and outlined contested and uncontested information gathered by Investigator Kohles. Both Plaintiff and Ms. Doe had the opportunity to submit comments to

the Investigator and/or additional questions that either Party believed should be asked. Both Parties had five (5) business days to submit their feedback.

82. On April 24, 2020, UNC informed Plaintiff that it had completed its investigation, and that Plaintiff needed "to meet with a Hearing Officer to determine responsibility for the alleged violations and any outcomes, consequences, or next steps required."

83. On April 24, 2020, the same day, Plaintiff emailed the UNC Office of Community Standards and Conflict Resolution (CSCR) to schedule a meeting with a hearing officer.

84. CSCR replied to Plaintiff on the same day (April 24) to ask if Plaintiff was available to meet at 11 AM on the following Monday, April 27.

85. The meeting was not confirmed by the end of business on April 24.  Plaintiff responded at 6:19 PM on April 24 that 11 AM on April 27th would work.

86. On the morning of April 27, 2020, CSCR emailed Plaintiff at 9:26 AM apologizing that it had not confirmed the meeting, but advising nonetheless that CSCR had just sent a calendar invite for 11 AM that same morning.

87. CSCR at no point told him that the meeting would be the hearing required by the Code. Instead, CSCR told Plaintiff that it was only a meeting and that among the things discuss would be "next steps required." .

88. CSCR's emails to Plaintiff failed to specifically state that it was scheduling a "hearing".

89. Instead, CSCR told Plaintiff only that he needed to "meet with" an officer.

90. Plaintiff was not given notice of a hearing three days in advance.

91. CSCR gave him just 1 hour and 34 minutes' notice in advance of the meeting.

92. Plaintiff was required to submit any witnesses or information to support his position at the hearing at least 24 hours before the hearing.

93. Plaintiff was never informed of this fact in the correspondence from UNC.

94. Plaintiff never knew that he needed to submit any witnesses or information to support his position at the hearing, as he did not know it was a hearing at all.

95. Plaintiff was never told that he needed to submit any relevant materials to the Hearing Officer 24 hours in advance of the hearing.

96. To the extent that Plaintiff was cited to the Code, Plaintiff had no reason to know that this "meeting" was in fact the hearing outlined in the Code.

97. Plaintiff was not given any other information about his rights with respect to the CSCR process.

98. Plaintiff was not informed that he may want to seek legal counsel regarding the allegations.

99. The alleged "hearing" was merely a meeting with a Hearing Officer.

100. The meeting lacked the formalities consistent with a hearing.

101. No formalities were observed before or during the Hearing Officer's April 27th meeting.

102. Instead, at this meeting, Plaintiff met with Colleen Sonnentag, Director of CSCR. Ms. Sonnentag essentially cross-examined Plaintiff about the things that had been said so far and the investigation's report. Plaintiff did not have the opportunity to present witnesses. Plaintiff did not have an adviser with him. In short, Plaintiff was not afforded a hearing at all.

103. CSCR issued a letter to Plaintiff on May 1, 2020, finding Plaintiff "Responsible" for violating the UNC Student Code of Conduct.

104.     CSCR's May 1, 2020, decision letter makes no reference to having held a hearing.

105.     CSCR's May 1, 2020, decision letter refers to the April 27, 2020, "meeting" at least 5

   times.

106.     The Hearing Officer's April 27th meeting was not a hearing.

107.     Mr. Brown-Smith was not given three days' notice of the meeting.

108.     Plaintiff was not given the materials being used against him in advance of the meeting.

109.     Plaintiff was not given notice that he had to turn in his own materials no later than 24

   hours before the meeting.

110.     Plaintiff was not given a proper hearing on his alleged conduct violations.

111.     In its June 24, 2020, response to Plaintiff's Statement of Appeal, CSCR stated that a

   hearing had been held.

112.     In its June 24, 2020, response to Plaintiff's Statement of Appeal, CSCR stated that "the

   hearing was held during a time which was agreed up [sic] by both parties".

113.     In its June 24, 2020, response to Plaintiff's Statement of Appeal, CSCR twice

   characterized the April 27, 2020, meeting as a "hearing".

114.     At no point in its June 24, 2020, response to Plaintiff's Statement of Appeal did CSCR

   refer to the April 27, 2020, meeting as a "meeting."

115.     In its June 24, 2020, response to Plaintiff's Statement of Appeal, CSCR did not

   conclude that Plaintiff was deprived of a hearing.

116.     In its June 24, 2020, response to Plaintiff's Statement of Appeal, CSCR did not

   conclude that Plaintiff was deprived of the opportunity to submit favorable information,

   witnesses, and/or other evidence.

117.     In its June 24, 2020, response to Plaintiff's Statement of Appeal, CSCR stated that due process owed to Plaintiff "was not denied".

118.     UNC did not correctly follow the procedures set forth in the Student Code of Conduct.

119.     UNC failed to inform Plaintiff of his rights.

120.     UNC denied Plaintiff the opportunity to participate in a hearing.

121.     If Plaintiff understood that what was happening was supposed to be a "hearing" regarding his liability or non-liability for violating the student code, he would have prepared differently.

122.     Plaintiff would have organized his thoughts. He would have asked more specific questions of Ms. Sonnentag. He would have prepared more specific defenses to the allegations that were made against him. For example, Plaintiff would have been able to present the evidence of Ms. Doe's text messages, discuss her statements to the investigator that were shared with Plaintiff, and explain in more detail why he understood all actions during the Incident to be consensual. Additional evidence may have been considered. For example, Plaintiff would have been able to present character witnesses, including staff members at UNC. Even if not dispositive of liability for a violation, such evidence may have been considered to impose a more reasonable sanction. And even if the evidence would have been largely the same, explanations regarding the evidence being considered and discussions about the evidence would have been vastly different if it were clear Plaintiff was participating in a "hearing" to determine liability.

123.     Instead, Plaintiff thought that he was participating in an informal meeting.

124.     Defendant, in his official capacity as UNC President, violated Plaintiff's student rights.

**IV.**     *Failure to Apply Correct Evidentiary Standard*

125.     UNC's Code defines preponderance of the evidence as whether "what is alleged to have happened is more likely than not what happened"

126.     The Hearing Officer found that it was more likely than not that Plaintiff committed physical abuse, harassment, and sexual misconduct.

127.     The decision and sanctions hinge on whether there was consent for the activities in which Plaintiff and Ms. Doe engaged. The overwhelming weight of the evidence was that the entire Incident was consensual. While Ms. Doe regretted the Incident, and perhaps really does feel uncomfortable about it, there is no doubt that Ms. Doe consented to the activity during the Incident.

128.     Ms. Doe verbally consented to the activities that she engaged in with Plaintiff.

129.     Ms. Doe specifically consented to the activities that she engaged in with Plaintiff.

130.     The April 24, 2020, letter from OIEC to Plaintiff included a document entitled University of Northern Colorado Title IX Investigation Report (the "Report").

131.     The Investigation Witness Interview of Abril Olivas begins on Page 13 of the Report.

132.     According to the report, on February 8, 2020, Ms. Doe sent Ms. Olivas a text message stating: "Like it was consensual because he asked permission for most stuff but idk dude part of me was like let's just see where this goes maybe there will be a connection … idk how to say no".

133.     On February 8, 2020, Ms. Doe sent Ms. Olivas text messages stating twice that Plaintiff asked for permission during their encounter.

134.     Ms. Doe stated the Incident was consensual.

135.     Ms. Doe was sober throughout the Incident.

136.     Plaintiff was sober throughout the Incident.

137.     Ms. Doe stated that Plaintiff asked her for permission.

138.     Ms. Doe never told Ms. Olivas that she did not consent.

139.     The report states "Based on the text messages, [Ms. Olivas] believed [Ms. Doe] was expressing regret and felt guilty about the incident."

140.     The report states Ms. Olivas "was surprised by" Ms. Doe's later texts stating that Ms. Doe did not give consent to sexual contact with Plaintiff.

141.     The report states Ms. Olivas "was surprised by" Ms. Doe's later texts stating that Ms. Doe did not give consent to sexual contact with Plaintiff because Ms. Doe "was now stating that the sexual contact was nonconsensual."

142.     The Hearing Officer did not correctly apply the preponderance of the evidence standard.

143.     The Hearing Officer's finding was unsupported by evidence.

144.     The Hearing Officer stated that Ms. Doe's giggling and saying "I guess" before kissing Plaintiff was an "equivocal response that cannot be construed as active consent."

145.     The Hearing Officer's finding contradicted the weight of the evidence indicating that Ms. Doe had consented.

146.     The Hearing Officer's findings are contradicted by Ms. Doe's own admissions.

147.     Based on the totality of the evening and the sequence of events that transpired, a

reasonable person would have believed that Ms. Doe consented to the activities in which she

and Plaintiff engaged.

148.     On May 1, 2020, the Hearing Officer sent Plaintiff the decision finding him

responsible for violating UNC's Student Code and imposing the following sanctions:

   a.  University SUSPENSION until 2022;
   b.  No Trespass Order;
   c.  Intake Assessment with a licensed professional counselor and any
       recommended treatment;
   d.  A Plan for Success (a high-quality 3-4 page writing assignment);
   e.  An 8-10 page research paper;
   f.  A follow-up meeting with UNC; and
   g.  No Contact.

149.     The sanctions and punishments imposed are not appropriate given the totality of the

facts of this case.

150.     UNC punished Mr. Brown-Smith more harshly than it punished other

respondents found liable of more egregious violations of the student code of

conduct.

151.     In 2017, the *Greeley Tribune*, the local newspaper where UNC is located, printed a

story that was critical of UNC's Title IX processes.[2]

152.     The Tribune printed the stories of two women who accused male students of rape.

---

[2] Regan Kelly, *The University of Colorado handles many rape cases administratively instead of in a court of law – many times, the victims aren't happy with the outcome*, Greeley Tribune, Oct. 17, 2017, https://www.greeleytribune.com/2017/10/21/the-red-tape-of-rape-unc-like-lots-of-universities-handles-many-rape-cases-through-title-ix-instead-of-a-court-of-law-many-times-the-victims-arent-happy-with-the-outcome/.

153.     The two stories involved accusations of forced sexual intercourse—the first woman was alert and awake during the assault, while the second woman was too inebriated to consent and woke up to a stranger having sex with her.

154.     In both instances, the University found the accused men responsible for sexual misconduct.

155.     In both instances, the men found responsible for sexual misconduct were allowed to continue taking classes at the university uninterrupted, or at least were allowed to return to their classes in a very short amount of time.

156.     Mr. Brown-Smith was never accused of anything as egregious as forced sexual intercourse. Ms. Doe and Mr. Brown-Smith engaged in sexual foreplay. Ms. Doe texted her friend saying that "it was consensual" because Mr. Brown-Smith asked permission for most things and she just wanted to see where things would go. Mr. Brown-Smith never had sexual intercourse with Ms. Doe or got anywhere close to that. Mr. Brown-Smith and Ms. Doe remained clothed throughout the entire incident. Mr. Brown-Smith stopped making sexual advances when Ms. Doe asked him to stop. Whatever one thinks of the merits of Mr. Brown-Smith's sexual misconduct case, no one can dispute that the facts of Mr. Brown-Smith's case are exponentially milder than the facts of the cases reported by the *Greeley Tribune*.

157.     Yet UNC sanctioned Mr. Brown-Smith far more harshly than it had sanctioned the previous male students from the article. Mr. Brown-Smith was suspended for two years and was not allowed on campus. He was not able to graduate (even though through graduating he would be off campus for good). He had to take classes regarding consent, complete counseling, and write essays and research papers about what he had learned.

158.    UNC's excessively harsh sanction was further violation of Mr. Brown-Smith's rights.

## FIRST CAUSE OF ACTION
### Violation of the Fourteenth Amendment of the
### United States Constitution Procedural Due Process

159.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth

herein.

160.    The Fourteenth Amendment to the United States Constitution provides that no state

shall "deprive any person of life, liberty, or property, without due process of law."

161.    A person has a protected liberty interest in his good name, reputation, honor, and

integrity, of which he cannot be deprived without due process.

162.    A person has a protected property interest in pursuing his education, as well as in

future educational and employment opportunities and occupational liberty, of which he cannot

be deprived without due process.

163.    Plaintiff's constitutionally protected property interest in his continued enrollment at

UNC and to be free from arbitrary dismissal arises from the policies, courses of conduct,

practices and understandings established by UNC.

164.    Plaintiff's constitutionally protected property interest further arises from the express

and implied contractual relationship between UNC and Plaintiff.

165.    It is well established that Fourteenth Amendment due process protections are required

in the higher education disciplinary proceedings.

166.    Thus, a person who has been admitted to a university, and who has paid tuition to that

university, has a protected property interest in continuing his education at that university until

he has completed his course of study. The state cannot deprive a person of this interest without due process.

167.     As a result, if Plaintiff as a UNC student faced disciplinary action that included the possibility of suspension or dismissal if found responsible for alleged sexual misconduct, then the Due Process provisions of the Fourteenth Amendment to the United States Constitution applied to the disciplinary process UNC used.

168.     Defendant UNC, as a public university, has an absolute duty to provide its students equal protection and due process of law by and through any and all policies and procedures set forth by the University.

169.     Plaintiff had made exceptional academic progress and had obeyed all institutional rules when he was wrongly suspended from UNC.

170.     Under both federal and state law, Plaintiff had a constitutionally protected property interest in continuing his education at UNC.

171.     Plaintiff was entitled to process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing. The allegations in this case resulted in a sanction that will have lifelong ramifications for Plaintiff, and are quasi-criminal in nature.

172.     Plaintiff was entitled to fundamentally fair procedures to determine whether he was responsible for the alleged sexual misconduct.

173.     In the course of such investigation and adjudication, UNC flagrantly violated Plaintiff's clearly established rights under the Due Process Clause of the Fourteenth Amendment through its repeated acts of deprivation of the minimal requirements of procedural fairness.

174.     UNC deprived Plaintiff of his liberty and property interests without affording him basic due process, including, but not limited to, his right to a fair adjudication, his right to be informed of the exact charges against him, his right to be heard by an impartial factfinder, to question his accuser, challenge the credibility of other adverse witnesses and present evidence and witnesses in support of his defense. Defendant conducted a superficial investigation and hearing biased against Plaintiff as a Black male student accused of sexual misconduct.

175.     UNC subjected Plaintiff to an insufficient process when they failed to provide Plaintiff with a fair and reasonable opportunity to defend himself and arrived at a predetermined, arbitrary and unwarranted decision.

176.     As a result, Defendant failed to provide Plaintiff with the basic due process protections that they are required to provide students accused of sexual misconduct.

177.     UNC was acting under color of state law when they showed intentional, outrageous, and reckless disregard for Plaintiff's constitutional rights.

178.     As a result of these due process violations, Plaintiff continues to suffer ongoing harm, including damages to his reputation and other non-economic and economic damages. He is unable to accept his admission into a graduate studies program because of the erroneous disciplinary finding.

179.     Accordingly, UNC is liable to Plaintiff for violations of the Due Process Clause of the Fourteenth Amendment.

180.     As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational, athletic and career opportunities, economic injuries and other direct and consequential damages.

181.     Plaintiff is entitled to injunctive relief from UNC's actions. Plaintiff's injunctive relief

should include: vacating the finding of sexual misconduct against him, readmitting Plaintiff as a

student at UNC, and allowing Plaintiff to graduate as he was set to do in May 2020.

## **PRAYER**

WHEREFORE, Plaintiff, Torrence Brown-Smith, prays for the following from this

Honorable Court:

A judgment awarding Plaintiff injunctive relief, including a judicial declaration that (i) the

outcome and findings made by UNC be reversed; (ii) Plaintiff's reputation be restored; (iii)

Plaintiff's disciplinary record be expunged; (iv) the record of Plaintiff's suspension from UNC

be removed from his education file; (v) any record of the complaint against Plaintiff be

permanently destroyed; (vi) Plaintiff be readmitted to UNC so that he may graduate; and (vii)

UNC's rules, regulations and guidelines are unconstitutional as applied; and such other and

further relief as the Court deems just, equitable and proper.

DATED this 4th day of January, 2022.

Respectfully submitted,

*s/ Timothy Galluzzi*
**Timothy Galluzzi, #48211**
CHENEY GALLUZZI & HOWARD, LLC
1888 Sherman Street, Suite 200
Denver, Colorado 80203
Telephone: (303) 209-9395
E-mail: tim@cghlawfirm.com

*s/ Kevin Cheney*
**Kevin Cheney, #49333**
CHENEY GALLUZZI & HOWARD, LLC
Telephone: (303) 209-9395
E-mail: kevin@cghlawfirm.com

*Attorneys for Plaintiff Torrence Brown-Smith*