IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-03271-MEH

TORRENCE BROWN-SMITH,

    Plaintiff,
v.

ANDREW FEINSTEIN, in his official capacity as President of the University of Northern Colorado,

    Defendant.

---

## ORDER

**Michael E. Hegarty, United States Magistrate Judge**.

Before the Court is Defendant's Motion to Dismiss Second Amended Complaint ("Motion"). ECF 46. Following the Court's order on the previous motion to dismiss, Plaintiff amended his pleading to assert only a claim pursuant to 42 U.S.C. § 1983 for violations of his Fourteenth Amendment constitutional right to due process. Defendant moves for dismissal on the basis of failure to state a claim. The Motion is fully briefed, and the Court finds that oral argument will not materially assist in its adjudication. For the reasons that follow, the Motion is granted.

### BACKGROUND

For purposes of this order, the Court accepts as true the factual allegations—but not any legal conclusions, bare assertions, or conclusory allegations—that Plaintiff raises in his Second Amended Complaint (ECF 41). *See generally Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (accepting as true a plaintiff's factual allegations for purposes of Fed. R. Civ. P. 12(b)(6) analysis).

Plaintiff alleges that in May 2020, he was unjustly suspended from the University of Northern Colorado ("UNC") based on a false accusation of sexual misconduct by a fellow student

and an inadequate investigation by Defendant. ECF 41 at ¶¶ 2–9. The allegedly false accusation relates to an instance of sexual activity between Plaintiff and Ms. Doe (name undisclosed, not a party to this action) which occurred on February 7, 2020. *Id.* at ¶ 5.

Plaintiff's description of his history with Ms. Doe, and their encounter in question, is as follows: Plaintiff was a student at UNC and was set to graduate in May 2020. *Id.* at ¶ 7. Ms. Doe met Plaintiff through their mutual involvement in the Black Student Union, of which Plaintiff was the President. *Id.* at ¶¶ 2, 43. Prior to February 7, Plaintiff and Ms. Doe had exchanged messages with each other, each commenting that they found the other attractive, and had made plans to spend time together after a meeting of the Black Student Union on February 7. *Id.* at ¶¶ 42, 44. Together, they went to a taphouse, though neither consumed alcohol, and later a coffeeshop, where they had conversations and "did a lot of dares" in connection with a game. *Id.* at ¶¶ 45–46. As a part of this game, Ms. Doe disclosed that her sexual history included "threesomes" and "kinky sex." *Id.* at ¶ 47.

When they left the coffeeshop, they agreed to go to Plaintiff's off-campus residence to watch a movie. *Id.* at ¶ 48. During the movie, Ms. Doe joined Plaintiff on his bed, after briefly "cudd[ling], as friends," Ms. Doe fell asleep. *Id.* at ¶¶ 50–51. When she awoke, Plaintiff asked if he could kiss her, to which her response was, "I guess." *Id.* at ¶ 52. Plaintiff then kissed Ms. Doe with his hands around her back and waist. *Id.* at ¶ 53. After a short interlude where Ms. Doe stated that she had to be careful because she could "go up a level," they began to kiss again, and Plaintiff briefly applied pressure on the sides of her neck to simulate strangling her, out of a belief (based on her body language and prior statements) that this was a sexual activity she preferred. *Id.* at ¶¶ 54–56. Plaintiff believes that he had consent for these actions based on her prior statements regarding her sexual history and "their active engagement in sexual activity." *Id.* at ¶¶ 57. After

2

another brief pause, Plaintiff began to digitally penetrate Ms. Doe. *Id.* at ¶¶ 59–60. Plaintiff notes that after this began, Ms. Doe sat up and told him "she did not want things to progress further 'because she wouldn't be able to stop herself if things heated up more.'" *Id.* at ¶ 62. Plaintiff stopped and withdrew his hand from Ms. Doe's pants. *Id.* Plaintiff alleges that Ms. Doe did not object or express displeasure at any point during the encounter until this statement. *Id.* at ¶¶ 63, 65, 67. Plaintiff then tried to kiss Ms. Doe again and positioned himself as if to perform oral sex; however, he did not continue because he was unsure if Ms. Doe consented to that act. *Id.* at ¶ 66. There was no further sexual contact after this point. Plaintiff proceeded to drive Ms. Doe to her car, upon her request, and she later texted him to confirm when she had made it to her home. *Id.* at ¶¶ 68–70.

The next day, Ms. Doe texted a friend and wrote, in regard to her encounter with Plaintiff, "Like it was consensual because he asked for permission for most stuff but idk dude part of me was like [sic] let's see where this goes maybe there will be a connection." *Id.* at ¶¶ 71–72. A few days later, Ms. Doe reported the incident during a walk-in intake interview with UNC's Title IX Coordinator, Larry Loften. *Id.* at ¶ 78. Ms. Doe described the sexual activities with Plaintiff and told Mr. Loften that they were performed without her consent. *Id.* at ¶ 87. In response, UNC initiated a Title IX investigation into the incident. Plaintiff received notice of the investigation and met with a UNC Investigator in the days following. *Id.* at ¶¶ 79–80. Approximately one month later, Plaintiff received a "Draft Investigative Report," which summarized contested and uncontested facts from each party and gave five days during which Plaintiff and Ms. Doe could submit comments to UNC regarding the findings. *Id.* at ¶ 81. About another month later, on April 24, Plaintiff was informed that UNC had completed its investigation, and required him to "meet with a Hearing Officer to determine responsibility for the alleged violations and any outcomes,

consequences, or next steps required." *Id.* at ¶ 82. Plaintiff emphasizes that he was not informed that this meeting constituted a "hearing" as described in UNC's Student Code of Conduct. *Id.* at ¶¶ 37, 87. Plaintiff maintains that he was not put on notice that this meeting would be a hearing, because, while the Code of Conduct uses the terms "meeting" and "hearing" interchangeably, it refers to the former only twice, and the latter forty-eight times, and states that a student must attend a "meeting *or* hearing." *Id.* at ¶¶ 28-40 (emphasis added). The Code of Conduct does not define "hearing," but it states that hearings will be conducted in an "informal manner," including, "[d]iscussion, inquiry, persuasion, and other existing informal procedures." *Id.* at ¶ 27. Plaintiff further alleges that he was provided insufficient advance notice of his hearing/meeting. *Id.* at ¶¶ 90–91. The Code of Conduct requires that students be provided with three days notice of any hearing, along with the time and place for such a hearing. *Id.* at ¶ 27.

On April 24, Plaintiff emailed UNC to schedule a meeting, and received a reply the same day asking if he was available to meet on the following Monday, April 27, at 11:00 a.m., but Plaintiff did not respond until after business hours, when he affirmed that the suggested date and time would work for him. *Id.* at ¶¶ 83–85. Plaintiff received no reply until Monday morning, at 9:26 a.m., when UNC apologized for not confirming the appointment earlier and sent a calendar invite for the agreed upon time, which at that point was one hour and thirty-four minutes away. *Id.* at ¶¶ 86, 91. A further requirement of the Code of Conduct is that Plaintiff submit a list of any witnesses or information in support of his defense twenty-four hours in advance of the hearing. *Id.* at ¶¶ 27, 92. Plaintiff claims that he was not notified of this requirement, and that the lack of proper three-day notice rendered it impossible for him to submit any materials twenty-four hours in advance. *Id.* at ¶¶ 93–95.

4

At the meeting/hearing, Plaintiff was questioned by Colleen Sonnentag, the director of UNC's Office of Community Standards and Conflict Resolution. *Id.* at ¶ 102. Plaintiff did not have an opportunity to present witnesses, nor did he bring an advisor with him. *Id*. Plaintiff was issued a letter on May 1, 2020, finding him "Responsible" for violating the Code of Conduct. *Id.* at ¶ 103. As a part of this decision, Plaintiff was suspended until 2022, postponing his graduation, with his readmittance into UNC conditioned upon his compliance with disciplinary measures. *Id.* at ¶ 157. Plaintiff notes that the letter he received makes no reference to a hearing and instead refers to the April 27 "meeting" five times. *Id.* at ¶¶ 104–05. When he later appealed this decision according to UNC's internal procedures, his appeal was denied, and UNC did not find that Plaintiff was deprived of the opportunity to submit favorable information, witnesses, and/or other evidence, nor that he was denied due process. *Id.* at ¶¶ 111–17.

Plaintiff claims that if he had understood that he was supposed to be having a "hearing" regarding his conduct, he would have prepared differently. *Id.* at ¶ 121. Specifically, he "would have organized his thoughts." *Id.* at ¶ 122. This would have allowed him to ask more specific questions of Ms. Sonnentag, prepare more precise defenses to the allegations against him, and present additional evidence including Ms. Doe's text messages and character witnesses. *Id.* Plaintiff argues that "even if the evidence would have been largely the same, explanations regarding the evidence being considered and discussions about the evidence would have been vastly different . . . ." *Id.*

Plaintiff also alleges that he was punished more harshly than other students who had been found liable of more egregious violations. *Id.* at ¶ 150. In particular, Plaintiff points to a 2017 article from the *Greeley Tribune* that was critical of UNC's Title IX processes. *Id.* at ¶ 151. The article described the stories of two women who accused male students of rape. *Id.* at ¶ 152. Both

5

stories involved accusations of forced sexual intercourse. *Id.* at ¶ 153. Although in both instances the men accused were found responsible for sexual misconduct, they were allowed to continue taking classes at the university. *Id.* at ¶¶ 154–55.

Based on these facts, Plaintiff alleges that his sanction was incommensurately harsh, and that the procedural irregularities which he encountered, as well as his ultimate suspension, were in violation of his right to due process under the Fourteenth Amendment.

## **LEGAL STANDARDS**

The purpose of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of a plaintiff's complaint. *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 2008). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that a plaintiff pleads facts that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. *Twombly* requires a two-prong analysis. First, a court must identify "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Iqbal*, 556 U.S. at 679–80. Second, a court must consider the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. If the allegations state a plausible claim for relief, then the claim survives the motion to dismiss. *Id.* at 680.

Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *S.E.C. v. Shields*, 744 F.3d 633, 640

(10th Cir. 2014) (quoting *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012)). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 878 (10th Cir. 2017) (quoting *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011)). Thus, while the Rule 12(b)(6) standard does not require a plaintiff to establish a *prima facie* case in a complaint, the elements of each alleged cause of action may help to determine whether the plaintiff has set forth a plausible claim. *Khalik*, 671 F.3d at 1191.

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. The complaint must provide "more than labels and conclusions" or merely "a formulaic recitation of the elements of a cause of action;" "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has made an allegation, "but it has not shown that the pleader is entitled to relief." *Id.*

## ANALYSIS

### I. Due Process Claim

"The Due Process Clause of the Fourteenth Amendment prohibits states from depriving 'any person of life, liberty, or property, without due process of law.'" *Doe v. Univ. of Denver*, No. 17-cv-01962-PAB-KMT, 2019 WL 3943858, at *10 (D. Colo. Aug. 20, 2019) (quoting U.S. Const. amend. XIV, § 1), *reversed on other grounds*, 1 F.4th 822 (10th Cir. 2021). "A court must 'examine

procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.'" *Messeri v. DiStefano*, 480 F. Supp. 3d 1157, 1163 (D. Colo. 2020) (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (alterations in original). Courts must evaluate three factors in determining the procedural protections required: (1) the interests of the individual in retaining his or her property and the injury threatened by the official action; (2) the risk of error through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and (3) the costs and administrative burden of the additional process, and the interest of the government in efficient adjudication. *Messeri*, 480 F. Supp. 3d at 1163 (citing *Mathews*, 424 U.S. at 335); *see also Watson ex rel. Watson v. Beckel*, 242 F.3d 1237, 1240 (10th Cir. 2001) (noting with approval the use of the *Mathews* factors in this context).

In Plaintiff's response brief, he focuses the alleged constitutional violation on essentially two actions by UNC and Defendant: (1) Plaintiff was not given a hearing; and (2) because he was not given a hearing, he could not adequately represent himself by presenting all evidence in the best way possible. ECF 49 at 9–10.

    **A.**    **Hearing**

Plaintiff maintains that his hearing/meeting with the Hearing Officer was frequently characterized only as a "meeting," and that this misled him into believing that he would have an additional, separate, "hearing." In its previous order, the Court found such an argument to be unpersuasive. For the same reasons, Plaintiff's Second Amended Complaint fails to establish that

Plaintiff was not given a hearing. The Code of Conduct states that "the procedure will normally be conducted in an informal manner. Discussion, inquiry, persuasion, and other existing informal procedures will normally be used." ECF 41 at ¶ 27. This clause should have put Plaintiff on notice that his "hearing" would not be a mirror image to a "hearing" in the legal sense of the word. Plaintiff alleges that "a reasonable person would expect different consequences of a meeting versus a hearing" and "a reasonable person would interpret the [Code of Conduct] to mean that a meeting and a hearing are not one and the same." *Id*. at ¶¶ 36–37. The Court is not bound by these conclusory allegations. *Iqbal*, 556 U.S. at 679–80. Based on the guidelines and rules set up in the Code of Conduct, Plaintiff received a "hearing" as it is contextually understood in the Code of Conduct, regardless of whether it met Plaintiff's expectations for a hearing. The use of interchangeable labels for the meeting/hearing may be a poor and confusing practice, but it is not evidence of a lack of constitutionally required procedures.

Plaintiff's strongest argument is that the April 24, 2020 letter does not advise him that he must submit a list of materials or witnesses twenty-four hours in advance of the hearing. ECF 49 at 10. But this argument fails to see the forest for the trees. "'All that is necessary' to satisfy due process 'is that the procedures be tailored, in light of the decision to be made, to 'the capacities and circumstances of those who are to be heard,' to insure that they are given a meaningful opportunity to present their case." *Watson*, 242 F.3d at 1241 (quoting *Mathews*, 424 U.S. at 349). When UNC sent the February 12, 2022 letter, it detailed the investigative process. ECF 46-1, Ex. A at 3.[1] UNC requested Plaintiff to "bring all evidence, documents and items that you believe will

---

[1] Defendant's Motion attaches and references documents outside the pleadings, including the February 12, 2020 and April 24, 2020 letters. *See* ECF 46-1, 46-2, 46-3, 46-4, 46-5. Plaintiff does not dispute the use of these documents and even joins in incorporating some of them. Because their use is not disputed, and they are mentioned in the Second Amended Complaint, central to the allegations, and their authenticity is not reasonably questioned, the Court can consider them

be helpful to the interviewer(s)." *Id.* at 4. Further, UNC asked for Plaintiff "to provide a list of any potential witnesses that you would like us to consider interviewing at this time." *Id.* Equipped with that knowledge, Plaintiff completed the interview process with the investigator which led to the production of the Draft Investigative Report. ECF 46-2, Ex. B. Plaintiff then had the opportunity to submit comments to UNC regarding the findings. ECF 41 at ¶ 81. When UNC issued the April 24, 2020 letter, it warned Plaintiff he could have an adviser at the meeting and that the "meeting, in addition to the fact finding report, will be used to determine if you are responsible for violation any polices or standards." Ex. B at 2. Plaintiff was thus on notice that this meeting would be determinative of his liability. The argument that had the letter simply used "hearing" instead of "meeting" it would have changed how Plaintiff approached the situation does not create a constitutional issue. Given the seriousness of the allegations, Plaintiff should have been on notice to use every opportunity to fully advocate for himself. The fact that he did not is unfortunate but of no constitutional moment. What matters now is whether UNC provided sufficient procedures to allow Plaintiff to be heard. Taking Plaintiff's well-pleaded allegations as true, UNC did.

**B.     Evidence**

Plaintiff claims that he was not adequately able to present all evidence in his defense. For the reasons already explained, UNC provided multiple opportunities for Plaintiff to present his side of the story, exonerating evidence, and witnesses in his defense. Plaintiff's arguments to the contrary are unavailing. First, Plaintiff maintains that UNC failed to provide him proper notice of the April 27 hearing/meeting. The Code of Conduct states, "[t]he student . . . subject to disciplinary action will be informed at least three (3) days prior to the hearing of a summary of the alleged

---

without converting the Motion into a motion for summary judgment. *Waller v City and Cnty. of Denver*, 932 F.3d 1277, 1282 (10th Cir. 2019).

behavior and code of conduct violation and the time and place of the hearing." ECF 41 at ¶ 27. Plaintiff was not provided final confirmation of his meeting/hearing until the day it was set to occur. *Id.* at ¶¶ 83–86. Although this may be a poor practice, it does not support Plaintiff's claims. While final confirmation was not provided until April 27, Plaintiff was contacted on April 24 regarding his availability on April 27 at 11:00 a.m. Plaintiff responded to say that he was available, but his response was given after business hours on April 24, which was a Friday. *Id.* Plaintiff cannot have expected UNC to change the requested time of the meeting/hearing after that point, once he had agreed to the date and time. If Plaintiff had been concerned by the lack of suitable notice, he certainly could have requested a later date and time, but he did not do so.

Second, Plaintiff alleges that, as a result of the lack of notice, he was denied the right to present favorable evidence on his own behalf. As with the previous pleading, there are flaws with this argument as to the Second Amended Complaint. To begin, Plaintiff reasonably knew that the meeting/hearing was going to occur on April 27 after he confirmed his availability to UNC on April 24, which gave him time to submit materials and witnesses ahead of the twenty-four-hour deadline required by the Code of Conduct. Next, Plaintiff does not identify any evidence or a single witness (other than a vague mention of "staff members at UNC," ECF 41 at ¶ 122) which he would have listed and presented in his defense if given the opportunity. Moreover, the report created by UNC contained evidence which Plaintiff believed was favorable to him. For instance, he argues that he "could have brought copies of Ms. Does' text messages to her friend with him to the hearing and gone over them line by line with Ms. Sonnentag . . . ." ECF 49 at 11. Those text messages were included in the report. Ex. B at 21. In addition, the report contained other mitigating evidence, including why Plaintiff believed his conduct with Ms. Doe was consensual. *Id.* at 8–9. In sum,

11

given the totality of the circumstances and the evidence available to UNC, there would have been little to no "probable value . . . of additional procedural safeguards." *Brown*, 599 F. App'x at 837.

Finally, although Plaintiff does not raise this in his reply brief, the Second Amended Complaint alleges that he was denied due process because he could not "question his accuser" at the hearing. ECF 41 at ¶ 174. "The Tenth Circuit has not so opined, but several district courts have found that a lack of meaningful cross-examination may contribute to a violation of due process rights of an accused student in a disciplinary hearing regarding sexual assault." *Norris v. Univ. of Colo., Boulder*, 362 F. Supp. 3d 1001, 1020 (D. Colo. 2019) (citing cases). However, the meaningful opportunity to cross-examine is applicable "where witness credibility is at issue . . . ." *Messeri*, 480 F. Supp. 3d at 1165; *see also Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018) ("[W]hen the university's determination turns on the credibility of the accuser, the accused, or witnesses, that hearing must include an opportunity for cross-examination."). After all, "[t]he Supreme Court has stated that '[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested.'" *Messeri*, 480 F. Supp. 3d at 1165 (quoting *Davis v. Alaska*, 415 U.S. 308, 316 (1974)).

Here, credibility was not a material issue. UNC's decision was largely based on Plaintiff's own account of his encounter with Ms. Doe. In fact, Plaintiff admitted to choking Ms. Doe. Ex. B at 9 ("In our second go around of kissing, that's when I made the **bad judgment** call of choking Ms. [Doe] in a sexual manner.") (emphasis in original). "The risk of unfair [action] is minimal because [Plaintiff] knew what he had done, knew it constituted ground for [disciplinary action], and took various opportunities to urge mitigation." *Brown*, 599 F. App'x at 837. Based on the well-pleaded facts in the Second Amended Complaint and the report by UNC, "[a]ny benefits [from greater procedural protections] would have been minimal . . . ." *Brown*, 599 F. App'x at 837.

## II.     No Leave to Amend

"In dismissing a complaint for failure to state a claim, the court should grant leave to amend freely 'if it appears at all possible that the plaintiff can correct the defect.'" *Triplett v. LeFlore Cty., Oklahoma*, 712 F.2d 444, 446 (10th Cir. 1983) (quoting 3 Moore's Federal Practice, ₱ 15.10 & n. 2 (1983)). However, "[a]t least outside of the pro se context, when a litigant fails to put the district court on adequate notice—in a legally cognizable manner—of his request for leave to amend, then the district court will not be faulted for failing to grant leave to amend." *Doe v. Heil*, 533 F. App'x 831, 847 (10th Cir. 2013). Pursuant to Fed. R. Civ. P. 15(a), "[t]he grant or denial of an opportunity to amend is within the discretion of the Court." *Maloney v. City of Pueblo*, 323 F.R.D. 358, 360 (D. Colo. 2018). As relevant here, it is within the court's discretion to deny leave to amend after a plaintiff has already been given "one opportunity to amend [its] complaint." *Bekkem v. Wilkie*, 915 F.3d 1258, 1275–76 (10th Cir. 2019). Here, Plaintiff is represented by counsel, and he already amended his Complaint twice. Plaintiff has not filed a motion to amend again. If the Court were to grant leave now, it would be acting sua sponte. The Court will not do so. *Id.* ("[W]e will not upset the district court's dismissal with prejudice on the grounds that it failed sua sponte to give [the plaintiff]—who was represented by counsel—an opportunity to file an amended complaint."); *see Burger King Corp. v. Weaver*, 169 F.3d 1310, 1318 (11th Cir. 1999) ("Although leave to amend should be liberally granted, a trial court is not required to sua sponte grant leave to amend prior to making its decision [to dismiss]."). Accordingly, Plaintiff's claim is dismissed with prejudice.

## **CONCLUSION**

It is important to remember that the question before the Court is whether Plaintiff's allegations demonstrate that UNC provided sufficient procedures to allow Plaintiff the opportunity to be heard prior to its decision to discipline him. Taking Plaintiff's well-pleaded allegations as

true and considering the relevant documents at issue, including UNC's report, that question is answered in the affirmative. Therefore, Plaintiff has failed to plausibly plead a constitutional violation and to state a claim. If the question was whether UNC's procedures were perfect (or even best practice), the answer would be different. But that is not the standard by which the law requires this Court to examine a procedural due process claim in this context.

ACCORDINGLY, Defendant's Motion [filed February 8, 2022; ECF 46] is **granted**. Plaintiff's claim is dismissed with prejudice. The Clerk of the Court is directed to close this case.

Entered this 10th day of May, 2022, at Denver, Colorado.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge